RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0138P (6th Cir.)
File Name: 03a0138p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

RICHARD BUGH,
      *Petitioner-Appellant,*

      *v.*                                    No. 01-3417

BETTY MITCHELL, Warden,
      *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-02342—David D. Dowd, Jr., District Judge.

Argued: February 5, 2003

Decided and Filed: May 13, 2003

Before: SILER, DAUGHTREY, and COLE, Circuit
Judges.

---

## COUNSEL

**ARGUED:** Theresa G. Haire, PUBLIC DEFENDER'S
OFFICE, OHIO PUBLIC DEFENDER COMMISSION,
Columbus, Ohio, for Appellant. M. Scott Criss, OFFICE OF
THE ATTORNEY GENERAL, CORRECTIONS
LITIGATION SECTION, Columbus, Ohio, for Appellee.
**ON BRIEF:** Christa M. Hohmann, David H. Bodiker,
PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC

DEFENDER COMMISSION, Columbus, Ohio, for
Appellant. M. Scott Criss, OFFICE OF THE ATTORNEY
GENERAL, CORRECTIONS LITIGATION SECTION,
Columbus, Ohio, for Appellee.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. In 1989, Petitioner
Robert Bugh was convicted of rape in Carroll County, Ohio.
In 1996, Bugh filed a petition for a writ of habeas corpus,
alleging that the trial court's admission of hearsay evidence
violated his confrontation rights; that the admission of prior
bad acts evidence violated his due process right to a fair trial;
and that his trial counsel provided ineffective assistance. The
district court ultimately denied the petition, and Bugh now
appeals. For the reasons stated herein, we **AFFIRM** the
decision of the district court.

## I. BACKGROUND

In early January 1989, Bugh's four-year-old daughter,
Robin, told her mother, Carolyn, that Bugh had sexually
molested her. Bugh was indicted and tried before a jury on
November 28 and 29, 1989 on one count of rape, in violation
of Ohio Revised Code § 2907.02(A)(1)(b). He was convicted
and sentenced to a term of imprisonment of not less than ten,
nor more than twenty-five, years. Bugh filed an appeal at the
state level, raising five assignments of error, three of which
are currently at issue in this appeal. The Seventh Appellate
District of Ohio affirmed Bugh's conviction and sentence on
March 14, 1991. *See State v. Bugh*, Carroll App. No. 594,
1991 WL 38013 (Mar. 14, 1991) (unreported). Thereafter,
Bugh sought discretionary review in both the Ohio Supreme
Court and the United States Supreme Court. Both requests
were denied. *See Ohio v. Bugh*, 502 U.S. 1112 (1992); *State
v. Bugh*, 577 N.E.2d 1105 (Ohio 1991).

On October 29, 1996, Bugh filed a habeas petition in the United States District Court for the Northern District of Ohio, raising three grounds for relief. First, Bugh alleged that the admission of the hearsay statements of Robin through four adult witnesses violated his rights under the Confrontation Clause. Second, Bugh alleged that the admission of testimony concerning prior acts of molestation allegedly committed by Bugh denied him a fair trial in violation of the Due Process Clause of the Fourteenth Amendment. The third ground for habeas relief was the alleged denial of effective assistance of counsel at trial in violation of the Sixth Amendment. The district court assigned the case to a magistrate judge, who, on February 4, 1999, recommended the denial of Bugh's petition. Bugh filed objections to the magistrate judge's report. On August 4, 1999, the district court heard oral argument on the claims involving the hearsay testimony and other acts evidence.

On November 22, 1999, the district court issued an Opinion and Order, denying Bugh habeas relief on the claims concerning the hearsay testimony and the admission of prior bad acts evidence. The district court also rejected most of Bugh's arguments concerning the ineffective assistance of counsel claim, but ordered an evidentiary hearing to determine whether trial counsel had strategic reasons for failing to obtain an independent mental health examination of Robin. Following an evidentiary hearing on December 15, 2000, Magistrate Judge George Limbert issued a report in which he recommended the denial of Bugh's ineffective assistance of counsel claim. On March 15, 2001, the district court issued its Opinion and Order, adopting Magistrate Judge Limbert's report and recommendation.

The district court issued a certificate of appealability as to three issues: "whether [Bugh's] federal constitutional rights were violated by the introduction of other acts testimony, by the introduction of hearsay testimony, or by the failure of his counsel to move for an independent [psychological] examination of the victim." On October 12, 2001, this Court

denied Bugh's application for a partial certificate of appealability as to the remaining issues.

## II. DISCUSSION

### A. Standard of Review

In an appeal of a habeas proceeding, we review the legal conclusions of the district court *de novo* and its factual findings for clear error. *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002); *Miller v. Francis*, 269 F.3d 609, 613 (6th Cir. 2001). "When the district court relies on a transcript from the petitioner's state trial and makes no independent determinations of fact, we review the district court's factual findings *de novo*, as well." *Withrow*, 288 F.3d at 850.

### B. Habeas Standards and the Antiterrorism and Effective Death Penalty Act

Because Bugh's habeas petition was filed on October 23, 1996, it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), which became effective on April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997). Under AEDPA,

> an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000) (quoting 28 U.S.C. § 2254(d)). Findings of fact made by a state court

are presumed correct and can be contravened only where the habeas petitioner shows by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001). "This presumption of correctness also applies to the factual findings of a state appellate court based on the state trial record." *Brumley*, 269 F.3d at 637 (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court elaborated upon the standard of review under § 2254(d), explaining that a state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." 529 U.S. at 413. An "unreasonable application" of clearly established federal law occurs when "the state court identifies the correct governing legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *see also Brumley*, 269 F.3d at 639. We may not overturn a state court decision unless we determine that the application of Supreme Court precedent was objectively unreasonable. *Brumley*, 269 F.3d at 639. Furthermore, "clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Withrow*, 288 F.3d at 850. We have recognized, however, that AEDPA does not require that the Supreme Court "must have previously decided the very case that a lower court has before it." *Withrow*, 288 F.3d at 850. Clearly established law "encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Id*.

## C. Right to Confront Witnesses

Bugh argues that his Sixth Amendment confrontation rights were violated when the trial court allowed four adults--

Carolyn Bugh, Faith Jones, Kate Noble Offenberger, and Dr. Joan Bothner--to testify as to out-of-court statements made by Robin concerning the abuse by her father. At trial, Robin only testified that Bugh "touched her privates," which, Bugh contends, alone could not sustain a rape conviction in Ohio.

### 1. State Court Proceedings

Carolyn Bugh, Robin's mother and Bugh's ex-wife, was the state's first witness. Carolyn testified that she had a conversation with Robin in January 1989, in which Robin told her that her father molested her:

> She told me that he asked her to touch his privates . . . [a]nd uh he also asked her to suck on it and she said that she did and he said that, or she said that he put her on top of him and put his privates against hers and squiggled them around.

The trial court overruled a hearsay objection to this testimony.

Robin testified after Carolyn, followed by Jones, Dr. Bothner, and Offenberger. Jones, a counselor who met with Robin for twenty-two sessions, testified that Robin had told her of Bugh's molestation:

> [W]e have an interview protocol that we use, using open ended questions and she told me that her father had touched her on her private parts and had put his private part up inside of her and at one time in the shower, he had her, he made her suck on his private part until juice came out.

The trial court overruled a hearsay objection to this testimony.[1]

---

[1] Bugh also argues that the trial court erred in admitting testimony in which Jones expressed her opinion that Robin was a victim of sexual abuse, and that this error violated the Confrontation Clause. The district court did not issue a certificate of appealability as to this issue.

Dr. Bothner, who performed a physical examination of Robin in February 1989, also testified as to Robin's statements concerning her father's sexual abuse. Dr. Bothner stated that, "Robin had told me uh in her own words, and I'll just quote this, that, 'Daddy touched my privates.' Stating it 'happened lots of times in the bathroom and in mommy's bed.'" Dr. Bothner further testified:

> She also stated, "Daddy touched my privates with his privates" and also stated it hurt. These are all her own words I'm reading here. Uh she also stated "that daddy told me to put my mouth on his privates," and when I asked her what that was like, she said juice came out of it. These again were her exact words. Uh when I asked her when these things had happened she stated, or how they happened, she stated, "he made me sit on his lap. They happened in the bathtub, in the shower as well as in the bed."

The trial court overruled objections to this testimony as well.

Finally, Offenberger, a social services supervisor employed by the Carroll County Department of Human Services, testified to what Robin had told her. Offenberger participated in the investigation of Bugh's case and interviewed Robin at the Minerva Police station in January 1989, and in her office in February 1989. In the first interview, Robin did not tell Offenberger of any sexual abuse. In the second interview, which was videotaped, Robin used anatomically correct dolls, teddy bears and a puppet to describe the sexual abuse. Offenberger testified that:

> At that time Robin told, uh demonstrated with the dolls that uh her father had touched her private parts. She demonstrated to me that the child female doll was put on top of the male doll. Prior to that she had undressed both the adult male doll, adult male anatomically correct doll

---

Accordingly, the claim is not before this Court. *See Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001).

and the child female doll. Uh she also indicated and demonstrated with the dolls that the child female doll put its mouth on the male penis. She also indicated to me that whenever the child female doll was, had its mouth on the adult male penis, that juice came out of her father's . . . penis whenever he did that.

The trial court overruled Bugh's objections to the admissibility of this testimony.

Based upon questioning during a pre-trial hearing, the trial court declared Robin competent to testify at trial. Despite having been deemed competent, Robin answered non-verbally through much of her examination. Robin, who testified while sitting on her mother's lap, stated that "Daddy touched my privates," and that this happened "in mommy's bedroom." She did not testify verbally thereafter, but answered questions by nodding her head affirmatively and negatively:

> Q: Okay. And when you say privates, what do you mean Robin? What part of your body?
> A. (No response).
> Q. Did something else happen too? Can you think of anything else that might have happened?
> A. (No response).
> Q. Okay. Did daddy have you touch any of his parts? Do you remember?
> A. (Nods head no.)
> Q. Have you told anybody else about this?
> A. (Nods head yes).
> Q. Do you know Faith Jones? You know who Faith is, don't you?
> A. (Nods head yes.)
> Q. Did you tell Faith about what happened?
> A. (Nods head yes.)
> Q. Okay. Did you tell mommy about what happened?
> A. (Nods head yes.)
> Q. Did you tell uh, do you know who Dr. Bothner is?
> A. (No response.)

Q. Do you remember going up to a big hospital in Akron?
A. (Nods head yes.)
Q. Did you talk to a doctor there?
A. (Nods head yes.)
Q. Was it a man doctor or a women doctor? Do you remember?
A. (Nods head no.)
Q. Okay. Did you tell that doctor what happened to you?
A. (Nods head yes.)
Q. When you told Faith what happened to you, did you tell Faith the truth?
A. (Nods head yes.)
Q. And when you told mommy what happened to you, did you tell mommy the truth?
A. (Nods head yes.)
Q. And when you told this doctor what happened to you, did you tell the truth?
A. (Nods head yes.)
Q. Do you remember when this happened Robin, do you remember what happened?
A. (Nods head yes).
Q. Okay. And can you tell us anything more about it?
A. (No response).
Q. Do you remember or do you not want to tell us what happened?
A. I don't remember.
Q. You don't remember. Okay. When you talked to Faith Jones, did you remember what happened?
A. (Nods head yes.)
Q. And when you talked to mommy did you remember what happened?
A. (Nods head yes.)
Q. Okay. And when you talked to the doctor in Akron, did you remember what happened?
A. (Nods head yes.)

Bugh's attorney then cross-examined Robin. Robin gave non-verbal answers to most of the questions posed to her on cross-examination, mostly by shrugging her shoulders:

Q. Do you remember ever telling your mommy about what you were talking to [the state's attorney] about?
A. (Shrugs shoulders.)
Q. Do you remember telling her about what you said to your daddy?
A. (Shrugs shoulders.)
Q. Where were you when you told your mommy about what your daddy did?
A. At home.
Q. Where honey?
A. At home.
Q. At home. Okay. Did you tell anybody else then what happened?
A. (Shrugs shoulders.)
Q. Did you tell your grandma or anybody else that you know?
A. (Shrugs shoulders.)
Q. Robin, has anybody asked you to say certain things here or to the doctor or to anybody else?
A. (Shrugs shoulders.)
Q. Has anybody asked you to say certain things about your daddy?
A. (Shrugs shoulders.)

. . .

Q. . . . Has anybody ever promised to give you any candy if you say something about your daddy? Hum?
A. (Shrugs shoulders.)
Q. You don't know? Has anybody promised to do anything for you if you say something about your daddy?
A. (Nods head no.)
Q. Robin I want you to think real hard about this question for me, okay? I want you to think before you shrug your shoulders or answer in any way. Will you think? Put your thinking cap on? Do you like your daddy?
A. (Nods head yes.)

In his state court appeal, Bugh argued that the testimony concerning Robin's out-of-court statements was inadmissible

hearsay, and that the admission of such testimony resulted in a denial of his Sixth Amendment right to confront witnesses against him. Specifically, Bugh contended that the testimony as to Robin's out-of-court statements was not admissible under the hearsay exception for excited utterances or non-hearsay statements of prior identification. In addition, Bugh argued that the statements of Jones, Dr. Bothner, and Offenberger were not admissible under the medical diagnosis exception to the hearsay rule.

The excited utterance exception, codified in Ohio Evidence Rule 803(2), provides that a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the rule against hearsay. OHIO EVID. R. 803(2). Bugh argued that Robin's statements to Carolyn Bugh were not excited utterances because, at the time Robin made the statements, there was no startling event which would have produced nervous excitement. The state appeals court rejected this argument and indicated that the exception applied. The state appeals court noted the "clear judicial trend in Ohio to recognize a liberalization of the requirements for an excited utterance when applied to young children victimized by sexual assaults." *Bugh*, 1991 WL 38013, at *4. The court also discussed *State v. Wagner*, 508 N.E.2d 164, 167 (Ohio Ct. App. 1986), in which the Ohio appeals court noted the "limited reflective powers" of a three-year-old and the lack of motive or reflective capacities to prevaricate the circumstances of an attack, as supporting the trustworthiness of a child's communications to others. According to the state appeals court, the facts of Bugh's case paralleled those in *Wagner*, and

[g]iven the fact that the child was of tender years, lacked sophisticated and detailed knowledge about sexual acts, that the statement was corroborated by physical evidence of penetration of the victim's vagina, and that the defendant was her father, the statement made by the victim to her mother contained sufficient indicia of reliability to justify its admission by the trial court.

*Bugh*, 1991 WL 38013, at *4. The court further noted that deference must be accorded to the trial judge's evidentiary ruling under Ohio law. *Id.*; *State v. Boston*, 545 N.E.2d 1220, 1230 (Ohio 1989) (stating that "the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule [excited utterance], should be sustained where such decision appears to be a reasonable one, even though the reviewing court . . . would have made a different decision.").

The state appeals court also rejected Bugh's argument that the testimony was inadmissible under the exception for statements of prior identification. Ohio Evidence Rule 801(D)(1)(c) states that a "statement is not hearsay if . . . [t]he declarant testifies at trial . . . and the statement is . . . one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification." OHIO EVID. R. 801(D)(1)(c). Bugh argued that this exception was inapplicable because Robin's statements were not made soon after perceiving the identity of the perpetrator, and Robin was not willing to testify about the statements at trial and did not remember having made them. The state appeals court noted that the Ohio Supreme Court, in *State v. Boston*, 545 N.E.2d at 1236-37, endorsed the use of this rule to admit a child's statements identifying the perpetrator of child abuse. *Bugh*, 1991 WL 38013, at *4. The state appellate court quoted the *Boston* court's holding that

a prior identification that is found reliable by a trial judge falls outside the hearsay rule if it is shown that the child-identifier, either at trial or a hearing, had been or is subject to cross-examination under oath concerning the identification statement and the child responds willingly to questions about the previous identification. If these conditions are met *and* the judge finds the statement of prior identification reliable, then the statement of the declarant can be admitted at trial through a third person to whom or in whose presence the identification was made.

*Id.* (quoting *Boston*, 545 N.E.2d at 1236-37). After recounting Robin's testimony that "Daddy touched my privates," and her non-verbal responses, in the form of nodding her head affirmatively and negatively, to various questions posed to her concerning the statements she had made, the state appeals court stated that

> [t]he trial court, having heard the testimony regarding the identification, found it to be reliable and admitted it. The child victim testified at trial and did respond to some of the limited questions posed by defense counsel regarding her statement during cross-examination with the manner in which a four-year-old child could be expected to react to a courtroom appearance to testify regarding a sexual act perpetrated upon her by her father.

*Id.* at *5.[2]

## 2. Habeas Proceedings

In his habeas petition, Bugh asserted that the testimony concerning Robin's statements by all four of the witnesses

---

[2] The state appeals court further held that, due to her tender age, Robin's statements to Dr. Bothner did not qualify under the hearsay exception for statements made for the purpose of medical diagnosis or treatment, codified in Ohio Evidence Rule 803(4), but that they were admissible under Ohio Evidence Rule 801(D)(1)(c). The court explained that the Ohio Supreme Court had stated that, in certain circumstances, Rule 801(D)(1)(c) was preferable to Rule 803(4) as a means of admitting such statements. *Boston*, 545 N.E.2d at 1236-37. The Ohio Supreme Court subsequently has modified its evidence rules and its decision in *Boston.* Specifically, the court has eliminated the rigid motivational requirement of Ohio Evidence Rule 803(4) in cases involving young children. *See State v. Dever*, 596 N.E.2d 436, 441-46 (Ohio 1992). Subsequent decisions in the Ohio appellate courts also have expressed disapproval of the liberal interpretation of Ohio Evidence Rule 801(D)(1)(c) in cases involving young children. *See, e.g., State v. Turvey*, 618 N.E.2d 214, 225 (Ohio Ct. App. 1992). In addition, since Bugh's trial, the Ohio Legislature enacted Evidence Rule 807, which took effect in July 1991, to govern the admission of hearsay testimony in child abuse cases.

was inadmissible hearsay and that the trial court erred in admitting it. Bugh further contended that this error resulted in a violation of his Sixth Amendment confrontation rights.

The Sixth Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause "does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v. Wright*, 497 U.S. 805, 813 (1990). The scope of the Confrontation Clause is more expansive than the general rule prohibiting hearsay; however, and the clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Id.* at 814.

The district court concluded that Bugh's confrontation rights were not violated because Bugh had the opportunity to cross-examine Robin and the witnesses who testified to Robin's out-of-court statements. The district court found that *United States v. Owens*, 484 U.S. 554 (1988) governed this issue. In *Owens*, the Supreme Court held that the Confrontation Clause does not bar the admission of prior, out-of-court statements of identification when a witness is unable, because of memory loss, to explain the basis for the prior identification. 484 U.S. at 559-64. The Supreme Court explained that the Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 559 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)). This opportunity is not denied "when a witness testifies as to his current belief but is unable to recollect the reason for that belief." *Id.* According to the Court, it "is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even . . . the very fact that he has a bad memory." *Id.*; *see also Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985) (per curiam) (holding that the Confrontation

Clause was not violated where an expert witness who testified as to his opinion could not recollect the basis upon which he had formed that opinion). Further, in *Fensterer*, the Court explained that:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

474 U.S. at 21-22. The *Owens* Court found this principle applied equally in the case of out-of-court statements. 484 U.S. at 559.

When a hearsay declarant does not testify in court, the Supreme Court has set forth a standard for determining whether the admission of hearsay statements violates the Confrontation Clause. In *Ohio v. Roberts*, the Court stated that an out-of-court statement is admissible only if it bears adequate indicia of reliability. 448 U.S. 56, 65 (1980).[3] The Court later explained the two ways in which a showing of reliability may be met: "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id*. at 66; *see also Idaho v. Wright*, 497 U.S. 805, 817-23 (1990) (elaborating upon the requirements of the two prongs announced in *Roberts*).

---

[3] The *Roberts* Court first stated that the proponent generally must demonstrate that the witness is unavailable. 448 U.S. at 65. However, the Supreme Court subsequently limited this unavailability requirement to cases in which the out-of-court statements initially were made in the course of a judicial proceeding. *See White v. Illinois*, 502 U.S. 346, 356 (1992).

In *Owens*, however, the Supreme Court stated with regard to the reliability analysis, "We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination." 484 U.S. at 560. Accordingly, after finding that *Owens* controlled this case, the district court held that Bugh's confrontation rights were not violated because Robin was present at trial and Bugh had the opportunity to cross-examine Robin as well as the other witnesses.

Bugh contends that the district court incorrectly found there to be no Confrontation Clause violation simply because Robin testified and was subject to cross-examination. Bugh argues that the prosecution's case was not subject to "the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings," *Maryland v. Craig*, 497 U.S. 836, 846 (1990), and that Robin was not in fact available for cross-examination as to her statements. Bugh contends that the district court's reliance on *Owens* is misplaced because (1) *Owens* was decided before both *Craig* and *Wright*, and (2) *Owens* involved an adult witness who had memory problems, while *Craig* and *Wright* involved child witnesses. Bugh contends that *Craig* and *Wright* demonstrate that other indicia of reliability were needed in order for Robin's statements properly to be admitted, and that the hearsay statements lacked the "particularized guarantees of trustworthiness" required for admission under *Wright*.

The Government argues that the state court's decision to permit the hearsay testimony is neither contrary to nor an incorrect application of clearly established federal law. The Government argues that *Owens* controls this case, and, consistent with that decision, there was no Confrontation Clause violation because Robin testified in court and was cross-examined, even if her responses were mainly non-verbal. According to the Government, by shrugging, Robin indicated that she had no recollection at the time, which is analogous to the witness whose memory failed in *Owens*.

### 3. Analysis

Under AEDPA, our review is limited to an inquiry into whether the state court decisions were contrary to, or involved unreasonable applications of, clearly established Supreme Court precedent. The state appeals court did not identify controlling Supreme Court precedent, or even explicitly rule that the admission of the hearsay statements did not violate the Confrontation Clause. In such circumstances, we have held that the "result of a state court's decision controls when the state court fails to explain its reasoning." *Thompson v. Bell*, 315 F.3d 566, 585 (6th Cir. 2003) (citing *Harris*, 212 F.3d at 943). Furthermore, in such circumstances, we have held that "the 'contrary to' rather than the 'unreasonable application' prong of § 2254(d)(1) governs because the state court 'did not, as the Supreme Court defined an unreasonable application, correctly identify the governing legal principle only to unreasonably apply that principle to the particular facts of the case at hand.'" *Thompson*, 315 F.3d at 586 (quoting *Doan v. Brigano*, 237 F.3d 722, 730 (6th Cir. 2001)). Thus, in reviewing Bugh's Confrontation Clause claim, we focus on the result of the state court decision to determine if it was contrary to clearly established Supreme Court precedent.

We cannot say that the result of the state court's decision was contrary to clearly established Supreme Court precedent. While the Supreme Court has not addressed a case with facts identical to those in this case, in *Owens* the Court clearly held that the Confrontation Clause guarantees only the opportunity for cross examination, and that the Clause is not violated by the admission of hearsay evidence when the witness's memory fails at trial. The *Owens* Court reiterated its previous statements in *Fensterer*, 474 U.S. at 22, that "the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities [in a witness's testimony and memory] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Owens*, 484 U.S. at 558. While counsel's cross-

examination of Robin may not have yielded the desired answers, and Robin may not have recalled the circumstances surrounding her previous statements, counsel clearly had the opportunity to expose such infirmities, by pointing out Robin's youth and lack of memory. The jury had the opportunity to observe Robin's demeanor, thus permitting the jury to draw its own conclusions regarding her credibility as a witness. As the Supreme Court has recognized, the "weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." *Id.* at 560. All of the elements of the confrontation right identified by the Supreme Court have been satisfied in this case: Robin was physically present in court and confronted the accused face-to-face; Robin was competent to testify and testified under oath; Bugh retained the full opportunity for contemporaneous cross-examination; and the judge, jury, and Bugh were able to view Robin's demeanor and body language as she testified. *See Craig*, 497 U.S. at 851.

Furthermore, the *Owens* Court rejected the idea that the dangers associated with hearsay required the testimony to be examined for either indicia of reliability or particularized guarantees of trustworthiness where the declarant is subject to cross-examination:

> We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination. In that situation, as the Court recognized in [*California v. Green*, 399 U.S. 149 (1970)], the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements.

484 U.S. at 560. Thus, other indicia of reliability were not required to admit the statements at issue. No Supreme Court precedent has established a contrary rule.

We reject the argument that *Owens* is inapplicable because it involved an adult, rather than child, witness who had memory problems at trial. The *Owens* Court did not limit its holding to cases involving adult witnesses. In fact, other courts have applied the rule in *Owens* in cases involving young children. *See, e.g.*, *United States v. McHorse*, 179 F.3d 889 (10th Cir. 1999); *United States v. NB*, 59 F.3d 771, 775 (8th Cir. 1995); *Carson v. Collins*, 993 F.2d 461, 464 (5th Cir. 1993); *Jones v. Dugger*, 888 F.2d 1340 (11th Cir. 1989). As we do in this case, those courts faced situations where the young child actually testified and was subject to cross-examination. Other courts have recognized that merely placing a child on the witness stand does not eliminate Confrontation Clause concerns. *See, e.g.*, *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1474 (8th Cir. 1991). While the mere physical presence of a child victim on the witness stand does not necessarily eliminate Confrontation Clause concerns, we will not second-guess the state court trial judge's determination that Robin was mature enough to testify and to be cross-examined. Counsel had the opportunity to cross-examine Robin, and this opportunity served to satisfy Bugh's confrontation rights. Robin's inability to recall many of the details surrounding her statements does not lead us to conclude otherwise. *See Owens*, 484 U.S. at 558.

Although we also disagree with Bugh's contention that the holdings of *Craig* and *Wright* are more relevant to Bugh's case, we find that, in any event, the result of the state court decision here does not violate the rules established in those cases. *Craig* involved a challenge to a Maryland statutory procedure that allowed a judge to receive, by one-way closed circuit television, the testimony of a child witness alleged to be the victim of abuse. 497 U.S. at 841.[4] The Supreme Court

---

[4]To use the Maryland procedure, the trial judge first must have determined that in-court testimony would cause serious emotional distress to the child, "such that the child cannot reasonably communicate." *Id.* The procedure allowed a child to be examined and cross-examined in a separate room, outside of the defendant's physical presence, while a video monitor displayed the testimony in the courtroom, where the judge and

addressed the question whether the Confrontation Clause categorically prohibits a child witness in an abuse case from testifying against a defendant at trial in such a manner, outside of the defendant's physical presence. *Id.* The *Craig* Court explained that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to the rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845. The Court elaborated on the elements of the right guaranteed by the Confrontation Clause, stating that the combined effect of the elements of confrontation,–"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* at 846. The *Craig* Court held that the Maryland procedure did not violate the Confrontation Clause, for, although it prevented a child witness from seeing the defendant face-to-face, the procedure preserved all of the other elements of the confrontation right: "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Id.* at 851. The Court also held, however, that a case-specific finding of necessity was required in such cases in order to determine whether the use of a procedure was necessary to further an important state interest. *Id.* at 853.

In *Wright*, the Supreme Court held that the admission of hearsay statements about alleged abuse made by a child declarant to an examining pediatrician violated the defendant's rights under the Confrontation Clause. In that case, the state trial court had determined that the three-year-

---

jury would remain. The child witness would not see the defendant at this time, but the defendant would remain in contact with defense counsel.

old victim was not capable of testifying at trial. 497 U.S. at 809. The state trial court had admitted the statements under Idaho's residual hearsay exception. The Supreme Court reversed, after determining that the State had not met its burden of proving that the child's statements bore sufficient indicia of reliability to withstand scrutiny under the Confrontation Clause. *Id.* at 816. The Court held that Idaho's residual hearsay exception was not a "firmly rooted hearsay exception" for Confrontation Clause purposes, because it "accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial." *Id.* at 817. Statements admitted pursuant to this exception "therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." *Id.* The Court then explained that particularized guarantees of trustworthiness also may be demonstrated from the totality of the relevant circumstances that surrounded the making of the statements and that render the declarant particularly worthy of belief. *Id.* at 819.

While it is true that *Craig* and *Wright* are factually similar to this case in that both cases involved children, a key fact distinguishes this case from both *Craig* and *Wright*--Robin confronted the accused in court and was subject to unrestricted cross-examination. Furthermore, the admission of Robin's hearsay statements was not contrary to the holdings in *Craig* and *Wright*. *Craig* did not involve the admission of hearsay statements through the testimony of other witnesses. *See White v. Illinois*, 502 U.S. 346, 358 (1992) (explaining that "*Craig* involved only the question of what *in-court* procedures are constitutionally required to guarantee a defendant's confrontation right once a witness is testifying"); *see also Schaal v. Gammon*, 233 F.3d 1103, 1107 (8th Cir. 2000) (noting that *Craig* involved in-court testimony, rather than out-of-court declarations). Rather, the Court held that the absence of face-to-face confrontation did not constitute a Confrontation Clause violation where the other elements of the confrontation right were satisfied and a proper finding had been made as to the necessity of

safeguards to protect the welfare of child abuse victims. *Wright*, 497 U.S. at 851-52. *Wright* held that Idaho's residual exception did not satisfy the reliability requirement for hearsay statements to satisfy the Confrontation Clause, as set forth in *Ohio v. Roberts*. *Wright*, 497 U.S. at 815-16. Unlike in *Wright*, however, Robin was present at trial and subjected to cross-examination. In such a case, an inquiry into the reliability of the statements is not needed to satisfy the Confrontation Clause. *See Owens*, 484 U.S. at 560. Accordingly, under *Owens*, *Craig*, and *Wright*, the admission of Robin's statements was not contrary to clearly established Supreme Court precedent.

### D. Evidence of Prior Bad Acts

The second issue on appeal is whether the admission of evidence concerning similar, uncharged acts of child molestation by Bugh violated Bugh's due process rights to a fundamentally fair trial.

The evidence at issue concerns the testimony of two prosecution witnesses. First, sixteen-year-old Keith Stout described an incident that occurred ten years earlier, when Bugh was Stout's stepfather and the two lived in the same household. At trial, Stout testified as follows:

Q. During the time that you lived in the same household with the defendant, did something happen between you and the defendant?
A. Yea.
Q. And you've indicated that you were how old at that time?
A. Six.
Q. And where did this happen?
A. Different parts of the house.
Q. Can you tell the jury please in your own words what happened?
A. Well, uh, he stick my penis in his mouth. He tried to make me put his in my mouth, but I didn't.
Q. How many times did this happen?
A. I really don't, can't say.

Q. More than one time?
A. Yes.
Q. Several times?
A. Yea.

The second witness who testified to Bugh's prior bad acts was Dr. Rick Thomas. Thomas, who had employed Bugh as a handyman at his residence, confronted Bugh after Thomas's daughter revealed that Bugh had sexually abused her. The trial court did not allow Thomas to testify as to what his daughter had said about Bugh, but did allow Thomas to relate what was said in the confrontation between the two men. Thomas testified as follows:

Q. . . .  I'm asking you what you told the defendant happened to your daughter?
A. That she had been touched sexually uh and uh had uh then been threatened to, threatened not to tell anybody about what, about what went on and that this had happened on a number of occasions.
Q. His response, when you related that to him was what?
A. Was positively, and that was what precipitated saying that he felt really bad about the situation and had sought counseling and such as that, and also that he, he responded negatively to having made any threats uh any threats of harm.

The trial court overruled objections to the other acts testimony, finding that Thomas's and Stout's testimony was admissible under Ohio evidence law, and that the defense had put the identity of the assailant at issue. The trial court also provided a limiting instruction, instructing the jury that the evidence of Bugh's prior bad acts could be considered "to determine the existence of purpose, motive, scheme, plan or system, or absence of mistake or accident . . . ," but could "not be considered as any proof whatsoever that the defendant did any act alleged in the indictment in this case." On direct appeal, the state appeals court held that the evidence of similar acts was admissible under Ohio law. *See Bugh*, 1991 WL 38013, at *2. Furthermore, the court rejected the

argument that Bugh's prior acts were too remote to be admissible, because the lapse in time was not "so great as to preclude all rational or logical connections to the charge facing appellant." *Id.* at *3.

The district court correctly ruled that it could not provide habeas relief even if the prior acts testimony was admitted in violation of Ohio law. "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.), *cert. denied*, 464 U.S. 962 (1983); *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) ("Because this is an appeal from a habeas corpus decision and not an appeal from Coleman's state conviction, we do not pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.'" (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988))).

Nonetheless, Bugh also alleges that the evidence was admitted in violation of federal law. Bugh argues that the evidence served only to demonstrate that Bugh was a "bad man," and was so prejudicial that "it poisoned the trial and violated [his] right to a fundamentally fair trial." The state appeals court did not address Bugh's federal constitutional due process claims. The district court rejected Bugh's constitutional claims, finding that Bugh failed to show that the state court decisions were contrary to, or an unreasonable application of, clearly established federal law. We review the result of the state court decisions to determine whether the result of those decisions is contrary to clearly established Supreme Court precedent. *Thompson*, 315 F.3d at 585. We hold that it is not.

When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Coleman*, 244 F.3d at 542; *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). Nonetheless, "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Wright*

*v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

In this case, the admission of prior bad acts evidence was not contrary to clearly established Supreme Court precedent. There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior injury evidence violated due process, thus warranting habeas relief. 502 U.S. 62, 75 (1991). The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. Moreover, in *Spencer v. Texas*, 385 U.S. 554 (1967), the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose is served. *Id.* at 563-64. The Court recognized that it was not "a rule-making organ for the promulgation of state rules of criminal procedure. And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Accordingly, the district court correctly found that there is no Supreme Court precedent that the trial court's decision could be deemed "contrary to," under AEDPA.

### E. Ineffective Assistance of Counsel

Finally, Bugh argues that his right to effective assistance of counsel was violated when his trial attorney, Richard Rumbaugh, failed to pursue an independent psychological examination of Robin in order to determine whether she was fantasizing or had been programmed to make the abuse allegations.

Before trial, on November 9, 1989, Rumbaugh sought an independent expert examination of Robin. The trial court, without granting or denying the motion, asked Rumbaugh to submit a name and resume for consideration. The trial court made clear that it would not delay the trial for purposes of an evaluation, stating, "So if it can't be done and completed and in our hands by the 27th, then it's too bad."

Rumbaugh testified that he had previously pursued the possibility of obtaining a psychological examination of Robin by speaking with a doctor at the Child & Adolescence Center in Stark County, Ohio. Rumbaugh was told that Bugh himself would have to contact the agency in order to set up an exam. Accordingly, Rumbaugh told Bugh to do so. On November 19, however, Bugh informed Rumbaugh that he was unable to schedule a timely appointment. When Rumbaugh learned that an evaluation would not be possible before the trial date, he decided not to pursue the issue further, and did not request a continuance.

On direct appeal, the state appeals court rejected Bugh's ineffective assistance of counsel claim, though the state court did not evaluate Bugh's ineffective assistance claim under federal law.

The Supreme Court set out the standards by which to judge an ineffective assistance of counsel claim in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must show that trial counsel's performance was deficient. *Id.* at 687. Under the first prong, the standard for attorney performance is "reasonably effective assistance." *Id.* A petitioner must show that trial counsel's representation fell

below an objective standard of reasonableness, and the inquiry must focus on "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689; *see also Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) ("*Strickland* cautions . . . that any court applying this analysis must do so with tremendous deference to trial counsel's decisions."). The *Strickland* Court further cautioned that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Second, the petitioner must show that the deficient performance prejudiced the defense, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687; *see also Campbell*, 260 F.3d at 551.

After an evidentiary hearing on the issue, the magistrate judge issued a report and recommendation, concluding that there were strategic reasons for counsel's decision. After de novo review, the district court accepted the report and recommendation, and denied Bugh's petition. The district court explained:

> Based upon his experience and investigation, Attorney Rumbaugh decided that a psychological exam of the victim was not essential to the defense. Rather, Attorney Rumbaugh focused his efforts on limiting the evidence to be admitted against the petitioner and discrediting the testimony of the victim's mother, the petitioner's ex-wife, to show that she had influenced their daughter's allegations due to vindictiveness from the divorce.

Bugh now argues that the district court erred in concluding that counsel had strategic reasons for failing to pursue the exam, and further contends that counsel's failure to pursue the

exam and to request a continuance prejudiced his case. Bugh claims that the record does not show that this was a strategic decision by counsel, and that the filing of a motion for continuance was within the minimum expected performance for counsel. We disagree.

Bugh has not overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. While Rumbaugh initially investigated the possibility of obtaining a psychological evaluation, he testified that he did not believe the issue was a priority, since the focus of the defense strategy was to limit the evidence against Bugh and to discredit Carolyn Bugh's testimony. Rumbaugh further testified that he did not think a psychological examination was essential to the defense because he did not believe Robin was a strong witness. In addition, Rumbaugh testified that he was unsure he would have used a psychological expert had he been able to obtain one earlier, as this decision would have depended on whether the testimony would have been favorable to the defense. When the trial judge determined Robin was competent to testify, Rumbaugh made the request for an independent exam only as a "formality, to protect the record," and did not realistically think that the request would be granted. The Government also presented expert testimony to support the argument that the decision not to pursue the exam was a strategic one.[5]

---

[5]Maryann Kovach, a legal expert in the field, testified that a psychological examination would not have been necessary if the trial strategy were to discredit Robin's mother. Moreover, counsel did not know whether the results of an exam would have been unfavorable to the defense. Asked whether the failure to file the motion constituted ineffective assistance of counsel, Kovach testified: "Not necessarily. If your trial strategy is to make it look like the child doesn't know, and then say that mom planted this idea, and look what a bad person mom is, then no." Kovach also stated that courts grant requests for exams of child sexual abuse victims only in extraordinary cases, "where good cause is found because such a request is outside the scope of Ohio Criminal Rule 16." She also indicated that a fantasy defense is difficult to argue where medical evidence shows abuse.

Even if Bugh could demonstrate that counsel's performance was deficient, his claim fails because he has not demonstrated that he was prejudiced by the alleged deficiency. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Bugh has not demonstrated a reasonable probability that, but for counsel's alleged error in failing to further pursue and obtain an independent psychological examination, the jury would have found him not guilty. Specifically, the physical evidence of sexual abuse would have prevented a successful defense that Robin was fabricating the abuse allegations. This evidence, in addition to the testimony of Robin, the other witnesses, and the evidence of prior acts of sexual abuse committed by Bugh, undermine the argument that there was a reasonable probability that an independent psychological examination of Robin would change the jury's verdict.

Consequently, the state court decisions are not contrary to clearly established Supreme Court precedent.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of habeas relief.