NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0433n.06

No. 16-2336

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 24, 2017
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ROBERT ANTHONY BOJAJ, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MARY BERGHUIS, Warden, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:    GIBBONS, ROGERS, and DONALD, Circuit Judges.

ROGERS, Circuit Judge.    Robert Bojaj was convicted of second-degree murder in Michigan after he rear-ended another car while intoxicated, killing the driver of the rear-ended car. The state trial court allowed the prosecution to introduce data from an event data recorder in Bojaj's car at trial without first examining the reliability of the evidence, despite Bojaj's request for a *Daubert* hearing on the issue. Bojaj now seeks a writ of habeas corpus, arguing that the state trial court's error denied him due process by rendering his trial fundamentally unfair. Because the Michigan Court of Appeals' decision denying Bojaj's constitutional claim on the merits was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, Bojaj is not entitled to relief.

While intoxicated, Bojaj rear-ended another car with his Lexus sedan on a divided highway at 1:30 a.m. on August 15, 2010, killing the woman who was driving the rear-ended car.

*People v. Bojaj*, No. 303884, 2012 WL 12941199, at *2 (Mich. Ct. App. Nov. 27, 2012). A jury

convicted Bojaj of second-degree murder for the incident in a Michigan trial court. *Id.* at *1. At

trial, Bojaj did not dispute that he was driving while intoxicated when he caused the wreck. *Id.*

His blood alcohol measured .26, three times over the legal limit of .08, two hours after the crash.

The Government's expert testified that this amounted to at least ten drinks for a man of Bojaj's

size. However, Bojaj did dispute that he had the requisite mens rea for second-degree murder,

*id.*, which in Michigan requires the defendant to have acted with at least "a high probability that

[his actions would] result in death and . . . with a base antisocial motive and with wanton

disregard for human life," *People v. Goecke*, 579 N.W.2d 868, 880 (Mich. 1998).

The prosecution sought to prove the requisite intent through lay and expert testimony

about Bojaj's erratic driving and speed immediately before the wreck. Four eyewitnesses

testified about Bojaj's driving. Two, a married couple who were riding down the highway

together when Bojaj passed them, estimated that Bojaj was traveling 100 mph. The couple also

observed Bojaj hit the rumble strips on the highway's left shoulder for three to five seconds

before quickly swerving across three lanes of traffic to the rumble strips on the right side of the

highway. *Bojaj*, 2012 WL 12941199, at *2. Another witness "described the Lexus as traveling

'at a very high rate of speed' and 'swerving.'" *Id.* The fourth eyewitness did not estimate

Bojaj's speed but saw Bojaj's car swerving from the left to the right side of the highway and

hitting the rumble strips. *Id.*

The prosecution's remaining evidence involved data from an event data record (EDR) in

Bojaj's Lexus and an expert crash re-constructionist's evaluation using that data. The Michigan

Court of Appeals described this evidence in detail:

> After establishing these facts, the prosecutor presented the testimony of Mark
> Jakstis, a Design and Technical Analysis Manager at Toyota Motor Sales, U.S.A.

Jakstis described the Lexus's EDR as "part of the airbag system," with the capability of recording certain information during a "trigger event" such as a crash. The EDR stores information acquired milliseconds before an accident, including the vehicle's speed, the engine speed, the accelerator pedal position, and the driver's brake use. The last vehicle speed recorded by the EDR in defendant's Lexus was 78.3 mph, which Jakstis described as "the maximum recordable speed for this vehicle." The EDR reported that the accelerator was "in the mid position," which meant that the driver was "pushing down on the accelerator a bit" and "still accelerating" at the time the EDR stopped recording data. According to Jakstis, the EDR reported that the Lexus's brakes had not been applied.

In addition to this information, Jakstis claimed that the EDR contained the Lexus's "Delta–V," which he defined as "the change in velocity of the vehicle during the crash." Jakstis interpreted the delta-V data as consistent with a "34 mile an hour change in speed during this crash," adding "and it's still going up." Under cross-examination Jakstis admitted that Toyota considered the EDR data system in defendant's Lexus a "prototype tool," and that the specific device was used only in Toyota vehicles. He conceded that Toyota designed the EDR "to look at the performance of an airbag system in a crash" rather than to aid law enforcement after an accident.

Michigan State Police Sergeant Kevin Lucidi, a "traffic crash reconstructionist," utilized the EDR data to formulate one of the two speed determinations he provided to the jury. Lucidi first calculated defendant's speed at the time of the impact without resorting to the EDR data, instead basing his calculations on the "conservation of linear momentum formula." This approach relies on "basic physics princip[le]s" predicated on physically-measurable components including the coefficient of friction, vehicle weights, the distance the vehicles traveled post-impact, and the speed of the victim's vehicle. Because the speed of [the victim's] vehicle at the time of impact was unknown, Lucidi assigned it three different speeds: 50, 60 and 70 mph. After plugging these numbers into an equation, Lucidi calculated speed ranges for the Lexus. He opined that based on this mathematical formula, the Lexus' minimum speed at impact ranged from 82 to 98 mph and that its maximum speed fell between 109 and 126 mph.

Lucidi then described a second, independent methodology for calculating defendant's speed which incorporated the delta-V supplied by the EDR. Applying the delta-V number testified to by Jakstis, Lucidi opined that if the [victim] was traveling between 50 and 60 mph at the time of impact, the Lexus's maximum speed ranged from 117 to 126 mph. Thus, Lucidi concluded that the top number in the speed range—126 mph—was the same regardless of the formula he employed.

The defense countered Lucidi's opinions with the testimony of accident reconstructionist Larry Petersen. Petersen criticized several of the assumptions

> built into Lucidi's calculations. For example, Petersen estimated that the front end of the Lexus contacted 50% of the rear of the [victim's car], while Lucidi believed the overlap percentage to have been 80%. Petersen believed that the correct coefficient of friction differed from the figure Lucidi relied on, because the pavement likely was somewhat damp. Petersen described the manner in which these variables changed the ultimate speed calculations. In Petersen's view, defendant's vehicle was moving at a speed between 85 and 97 mph when the crash occurred.

*Id.* at *2–*3.

Before trial, Bojaj had requested a *Daubert* hearing to challenge the foundation of Lucidi's accident-reconstruction testimony, which the trial court had denied.[1] After the jury returned a guilty verdict on the second-degree murder charge, Bojaj moved for a new trial, arguing that the trial court's admitting the EDR data without holding a *Daubert* hearing to rule on the evidence's reliability violated Bojaj's due process rights by denying him a fair trial. *Id.* at *3–*4. The trial court agreed and granted Bojaj's request for a new trial. *Id.* In so ruling, the court explained that before trial it did not understand the nature of Bojaj's *Daubert* request but that the EDR's reliability was seriously questioned at trial—the read-out tool used to extract information from the EDR is a prototype, Toyota warns that EDR data is not reliable unless independently corroborated, and the EDR was developed to provide airbag statistics, not for accident reconstruction. The court also noted: "This certainly isn't some harmless error, as well. . . . It's not curable."

However, the Michigan Court of Appeals reversed the trial court's decision. *See Bojaj*, 2012 WL 12941199, at *5. The state appellate court agreed that, "before allowing Lucidi to use the data as a foundation for his testimony, the trial court was required to hold a *Daubert* hearing." *Id.* Although the court recognized that Bojaj had alleged a due process violation, it

---

[1] Michigan Rule of Evidence 702 incorporates the reliability standards announced by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 408 (Mich. 2004).

labelled the trial court's error "preserved nonconstitutional error." *Id.* at *4, *5. The court of appeals then explained that the error did not warrant a new trial because it was harmless:

> Even assuming that the EDR data was erroneously admitted, the exceedingly high speed at which defendant was driving immediately before the accident was independently corroborated by eyewitnesses and Lucidi's conventional speed calculation. Admittedly, the delta-V and other evidence purportedly derived from the EDR carried the weight of advanced technology. But other powerful evidence demonstrated that defendant elected to drive after consuming an enormous amount of alcohol, operated his vehicle at a speed approximating 100 mph, repeatedly crossed multiple traffic lanes, and ignored the rumble strip's audible warning that he was out of control. Given this evidence, any impropriety in admitting the EDR data did not undermine the reliability of the verdict.

*Id.* at *5. The Michigan Supreme Court denied Bojaj's application for leave to appeal this decision. *See People v. Bojaj*, No. 146805, 834 N.W.2d 502 (Mich. 2013).

Bojaj then petitioned the district court for a writ of habeas corpus, arguing that the trial court's error violated the Fourteenth Amendment's Due Process Clause by depriving him of a fundamentally fair trial. The district court denied the petition. *See Bojaj v. Berghuis*, No. 14-CV-12193, 2016 WL 4502438, at *9 (E.D. Mich. Aug. 29, 2016). The district court began its analysis by examining whether the Michigan Court of Appeals adjudicated Bojaj's due process claim on the merits, which would subject Bojaj's petition to AEDPA's deferential standard of review. *See id.* at *4. Although the district court left the question undecided, it indicated that de novo review was likely appropriate:

> [I]t appears that the Michigan Court of Appeals simply cast the failure to hold a *Daubert* hearing as "nonconstitutional" error without ever saying why there was no due-process violation . . . . Perhaps an argument could be made that the Michigan Court of Appeals had—silently—concluded that the absence of a *Daubert* hearing "qualifie[d]" as nonconstitutional error *because* that error was not severe enough to rise to a constitutional due-process violation. Although the Court thinks this is a somewhat strained reading of the appellate court's opinion, it is not an implausible one.

*Id.* (second alteration in original).

The district court then held, applying de novo review, that Bojaj's due process argument fails. The court cited *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007), for the relevant constitutional standard: "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Bojaj*, 2016 WL 4502438, at *4 (quoting *Ege*, 485 F.3d at 375). The trial court's admitting the EDR data without verifying its reliability did not create a constitutional violation under this standard, the court reasoned, because even if the data were inadmissible, "a number of factors . . . substantially reduced the prejudice of its admission." *Id.* at *5. "First, the jury heard how the delta-v might be unreliable." *Id.* "Second, Bojaj was able to counter Lucidi with his own expert." *Id.* "Third, expert testimony was not the only evidence the jury heard about Bojaj's excessive speed. At least three eyewitnesses thought that Bojaj was driving in the range of 100 mph." *Id.* The district court also noted that excessive speed was not the only factor present to prove the intent required for second-degree murder; the prosecutor argued to the jury that Bojaj's extreme level of intoxication and erratic driving, in addition to his speed, supported the requisite mens rea. *Id.* Therefore, the district court held, because the EDR data was not so prejudicial as to deprive Bojaj of a fundamentally fair trial, no constitutional violation occurred, and there is no grounds for habeas relief. Bojaj now appeals.

We review Bojaj's due process claim under AEDPA deference, because the Michigan Court of Appeals adjudicated the claim on the merits. Bojaj undoubtedly presented a due process argument to the Michigan Court of Appeals, which recognized the constitutional argument in its opinion then expressly treated the issue as "preserved nonconstitutional error," *Bojaj*, 2012 WL 12941199, at *4, *5. In such a situation, when a state court was faced with a habeas petitioner's constitutional argument but silently rejected it, "a federal habeas court must

presume" that the state court adjudicated the federal claim on the merits. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *see Harrington v. Richter*, 562 U.S. 86, 99–100 (2011). Bojaj makes no argument to rebut the strong *Harrington–Johnson* presumption. Thus, the Michigan Court of Appeals' decision is subject to AEDPA deference under 28 U.S.C. § 2254(d).

Applying AEDPA deference, the Michigan Court of Appeals did not err in its merits adjudication that the trial court's admitting the EDR data without holding a *Daubert* hearing did not implicate the Due Process Clause. As Judge Boggs explained in a portion of his dissent in *Ege*, "we have observed on a number of occasions that when a habeas claim is predicated on evidentiary issues, relief depends on the existence of [Supreme Court] precedent establishing the *particular type* of evidence at issue as violating the defendant's *due process* rights." *Ege*, 485 F.3d at 383 (Boggs, J., dissenting). For example, in *Bugh v. Mitchell*, 329 F.3d 496 (6th Cir. 2003), a petitioner argued that the state trial court had deprived him of a fundamentally fair trial by admitting propensity evidence against him in the form of prior bad acts. We denied the petitioner's claim under AEDPA deference, reasoning that "no clearly established Supreme Court precedent . . . holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Id.* at 512; *see also Maldonado v. Wilson*, 416 F.3d 470 (6th Cir. 2005) (admission of polygraph results). In *Bugh*, how the propensity evidence affected the petitioner's trial did not matter to our AEDPA analysis. Here, we similarly focus AEDPA deference on whether the trial court's particular state-law evidentiary error implicates the Constitution, not on how the error affected Bojaj's trial.

Because the Michigan Court of Appeals' decision that the trial court's error did not render Bojaj's trial fundamentally unfair is neither contrary to nor involves an unreasonable application of clearly established Supreme Court precedent, Bojaj is not entitled to habeas relief.

The Supreme Court has never held that admitting evidence of questionable reliability against a criminal defendant without holding a *Daubert* hearing or similar procedure violates due process. Furthermore, it was not objectively unreasonable for the Michigan Court of Appeals effectively to decide that this type of error does not implicate due process. The Supreme Court did not set a constitutional floor for the reliability of scientific evidence in *Daubert*, *see Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998), and screening evidence through *Daubert*'s standards is not constitutionally required. Rather, as the district court explained, "state rules of evidence are the primary safeguard against unreliable expert testimony being put before the jury[,] and the Due Process Clause serves as a distant backstop to these rules." *Bojaj*, 2016 WL 4502438, at *6; *see Dowling v. United States*, 493 U.S. 342, 352 (1990). Thus, the Michigan Court of Appeals was not unreasonable to treat the trial court's error in admitting the EDR data as solely a non-constitutional issue.

Even applying the case-specific approach from *Ege* that the district court employed, Bojaj is not entitled to habeas relief. In *Ege*, we evaluated whether a criminal defendant was denied due process by a state court's erroneous admission of prejudicial evidence in a nuanced way, by analyzing the extent to which the challenged evidence prejudiced the defendant's criminal trial. 485 F.3d 364; *see Brown v. O'Dea*, 227 F.3d 642 (6th Cir. 2000) (taking the same approach). *Ege* explained that, if the challenged evidence, contrasted against the prosecution's properly admitted evidence and the defendant's rebuttal evidence, was "a crucial, critical highly significant factor" in bringing about a guilty verdict, the improperly admitted evidence creates a due process violation. *See Ege*, 485 F.3d at 375. The dissenting opinion in *Ege* described that the majority's analysis was "at odds" with how this court had previously approached similar due process challenges in *Bugh* and *Maldonado*. *See id.* at 383 (Boggs, J., dissenting). We need not

decide whether *Ege* marks a change in this court's approach to analyzing when a state-law evidentiary error creates a due process violation, however, because even following *Ege*, the trial court's error did not render Bojaj's trial fundamentally unfair. Even assuming the EDR data and Lucidi's related testimony would have been excluded under *Daubert*, the evidence's prejudice was tempered for all the reasons listed by the district court: the jury heard about the data's unreliability, Bojaj rebutted Lucidi with his own accident reconstructionist, lay-witness testimony confirmed that Bojaj was driving recklessly and speeding near 100 mph, and factors other than Bojaj's speed support the jury's finding of the requisite mens rea for second-degree murder. Thus, under either a case-specific or categorical analysis, the Michigan Court of Appeals did not err by denying Bojaj's due process claim.

Finally, Bojaj makes a strange argument that the doctrine of invited error precludes the warden from arguing against his habeas petition. The argument clearly fails. Bojaj says that, because the government had once argued that a *Daubert* hearing was not required, the government could not later defend the position that, if a *Daubert* hearing *was* required, denial of the hearing was harmless error. The invited-error doctrine prohibits a party from requesting a particular position, and then later claiming that the same position is error. *See Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir. 1991). That did not happen here. Because the government's stance in this case has consistently been that no *Daubert* hearing was required and that the EDR data was admissible, the doctrine does not apply. Nothing prevented the warden from arguing that, even if the district court erred, the error either did not amount to a constitutional violation or was harmless.

The judgment of the district court is affirmed.