*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KEVIN KEITH,

          *Petitioner-Appellant,*

    *v.*

No. 01-4266

BETTY MITCHELL, Warden,

          *Respondent-Appellee.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00657—Peter C. Economus, District Judge.

Argued: July 20, 2005

Decided and Filed: July 10, 2006

Before: BOGGS, Chief Judge; and CLAY and GIBBONS, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** Harry R. Reinhart, REINHART LAW OFFICE, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Harry R. Reinhart, REINHART LAW OFFICE, Columbus, Ohio, Carol Wright, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

      BOGGS, C. J., delivered the opinion of the court, in which GIBBONS, J., joined. CLAY, J. (pp. 14-23), delivered a separate opinion concurring in part and dissenting in part.

───────────────

### OPINION

───────────────

      BOGGS, Chief Judge. Kevin Keith appeals the district court's order denying his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Six claims were certified for appeal. Three claims concern ineffective assistance of trial counsel: (1) failure to properly investigate and present mitigation evidence; (2) failure to object to the court's removal of "scrupled jurors" during *voir dire*; and (3) failure to conduct meaningful *voir dire*. Two claims concern the trial court's actions: (4) removing scrupled jurors without attempting to rehabilitate them; and (5) failure to inquire into Keith's reasons for filing an affidavit of indigency. The final claim (6) is that the cumulative effects of the above errors deprived Keith of his rights to effective assistance of counsel, a fair trial, and fair sentencing. Finding no prejudicial error in the proceedings below, we affirm the denial of Keith's petition for habeas corpus.

1

# I

Keith filed his habeas corpus petition in September 1999, well after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"); therefore, the provisions of that Act apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003), *opinion altered on denial of reh'g*, 348 F.3d 174 (2003), *cert. denied*, 541 U.S. 1095 (2004). The Ohio Supreme Court determined the facts that are quoted below, on direct appeal. Under AEDPA, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Also, Keith does not contest any of these factual findings.

Appellant, Kevin Keith, appeals from his convictions and sentence to death for the aggravated murders of Marichell Chatman, Linda Chatman, and Marchae Chatman and his convictions for the attempted aggravated murders of Quanita Reeves, Quinton Reeves, and Richard Warren.

On the evening of February 13, 1994, Marichell Chatman, her seven-year-old daughter, Marchae, and Richard Warren, who had been living with Marichell and Marchae for several weeks, were at Marichell's apartment in the Bucyrus Estates. At the time, Marichell was babysitting her young cousins, Quanita and Quinton Reeves. At approximately 8:45 p.m., Marichell's aunt, Linda Chatman, arrived at the apartment to pick up Quanita and Quinton, Linda's niece and nephew.

A few minutes after Linda arrived, Warren, momentarily diverted from a basketball game he was watching on television, noticed a man standing outside the apartment door. Although the man began to walk away without knocking, Warren opened the door. The man turned and asked for Linda.

While Linda went outside and spoke with the man, Marichell told Warren the man's full name. Although Warren could recall only the first name, Kevin, he later identified appellant as the man at the door. Marichell also mentioned that Kevin had been involved in a big drug bust.

After a short time, Linda and appellant returned to the apartment, where appellant and Warren had a brief conversation. According to Warren, appellant appeared to have his turtleneck shirt pulled up over the bottom part of his face and even drank a glass of water through it.

After drinking the glass of water, appellant pulled a nine-millimeter handgun from a plastic bag he carried and ordered everyone to lie on the floor. Appellant repeatedly scolded Marichell for using his first name when she asked what he was doing and why. Despite Marichell's pleas with appellant on behalf of the children, appellant placed the gun to her head. After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of aggravated trafficking.

Next, Warren heard a gunshot but was forced to turn away when a bullet struck him in the jaw. Warren heard ten to twelve additional shots, two more striking him in the back. After he heard the apartment door close, Warren ran out of the apartment, across a snow-covered field to Ike's Restaurant, yelling for help. Four or five more shots were fired, one striking him in the buttocks and knocking him down. Warren was able to get up and obtain help from the restaurant.

Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw

a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.

When medical personnel arrived at the Bucyrus Estates apartment, Linda and Marichell Chatman were dead, having suffered multiple gunshot wounds, including fatal wounds to the neck or head. All three children initially survived the attack. However, Marchae's two gunshot wounds to her back proved fatal. The Reeves children each sustained two bullet wounds and serious injuries.

Approximately eight hours after the shootings, Warren was recovering from surgery at a Columbus hospital. During a postoperative interview with a nurse, Warren wrote "Kevin" on a piece of paper as the name of his assailant. Later that day, Bucyrus Police Captain John Stanley had two telephone conversations with Warren. During the second conversation, Stanley mentioned three or four possible last names for Kevin. At trial, Stanley could only recall that he mentioned the names Kevin Thomas and Kevin Keith. Warren stated that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number—"043." The indentation from the license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail, under the pseudonym of Sherry Brown, a few weeks after the murders.

The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures. Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.

The grand jury indicted appellant on three counts of aggravated murder, each carrying a specification that the murder was committed as part of a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). Appellant was also indicted on three counts of attempted aggravated murder. R.C. 2923.02.

After a two-week trial, a jury found appellant guilty of all counts. Following the verdict, defense counsel requested a presentence investigation and a postconviction sanity hearing. During the penalty phase of the trial, defense counsel waived both opening and closing statements. The court submitted, without objection, the presentence investigation report and the results of the psychological

examination to the jury.  The jury recommended and the trial court imposed a death
sentence for each of the aggravated murder counts.  The court of appeals affirmed
the convictions and the sentence.

*State v. Keith*, 684 N.E.2d 47, 52-54 (Ohio 1997).

The Ohio Third District Court of Appeals affirmed the conviction and sentence in an
unpublished opinion.  *State v. Keith*, No. 3-94-14, 1996 WL 156710 *and* 156716 (Ohio Ct. App.
Apr. 5, 1996).  The Ohio Supreme Court also affirmed, *State v. Keith*, 684 N.E.2d at 69, and the
United States Supreme Court denied Keith's petition for a writ of certiorari.  Keith next filed a
petition for post-conviction relief, which was dismissed by the trial court without a hearing.  The
denial was affirmed by both the Third District Court of Appeals, *State v. Keith*, No. 3-98-05, 1998
WL 487044 (Ohio Ct. App. Aug. 19, 1998), and the Ohio Supreme Court.  *State v. Keith*, 703
N.E.2d 326 (Ohio Dec. 23, 1998) (Table).  The Ohio Supreme Court also denied Keith's motion for
reconsideration.  *State v. Keith*, 705 N.E.2d 368 (Ohio Feb. 3, 1999) (Table).  Again, the United
States Supreme Court denied certiorari.

Keith filed his petition for a writ of habeas corpus on September 3, 1999, presenting eight
grounds for relief.  In an amendment to his petition, Keith withdrew part of his eighth ground for
relief, but added grounds nine and ten.  After finding several of Keith's issues or subissues either
procedurally defaulted or waived, the district court addressed the remainder on the merits but
determined that none warranted federal habeas corpus relief.  Accordingly, the district court denied
the § 2254 petition in June 2001.  Keith's motion to alter or amend the judgment was denied on
October 17, 2001.  After Keith filed a Notice of Appeal and Notice of Intent to Seek a Certificate
of Appealability, this panel remanded the case with instructions to the district court to consider the
issues raised in the Certificate of Appealability ("COA").  In March 2003, the district court granted
a COA on three issues (failure to inquire into affidavit of indigency, counsel's decision to present
presentence report and psychological evaluation to jury, and counsel's cumulative errors).  The
panel then granted a COA on three additional claims (exclusion of scrupled jurors, counsel's failure
to object to exclusion of scrupled jurors, and counsel's failure to conduct meaningful *voir dire*).

**II**

This court reviews the district court's conclusions of law and mixed questions of law and fact
*de novo*, and reviews its findings of fact for clear error.  *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th
Cir.), *cert. denied*, 540 U.S. 930 (2003).  The deferential AEDPA standards of review apply in this
case.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  Under AEDPA, a writ of habeas corpus
must be denied unless the state court decision (1) "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme Court of the United
States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence
presented in the State court proceedings."  28 U.S.C. § 2254(d)(1)-(2).

Under the "contrary to" clause, a federal court may grant habeas relief if the state court
arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the
state court decides a case differently than the Supreme Court has decided on a set of materially
indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Bugh*, 329 F.3d at 501.
"'[C]learly established Federal law, as determined by the Supreme Court of the United States,' refers
to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the
relevant state-court decision.'"  *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004) (*quoting*
*Williams*, 529 U.S. at 412).

Under the "unreasonable application" clause, a federal court may grant habeas relief if the
state court identifies the correct governing legal principle from the Supreme Court's decisions but

unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08; *Bugh*, 329 F.3d at 501. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context. *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 540 U.S. 1004 (2003). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003), *cert. denied*, 543 U.S. 1080 (2005).

Keith raises six claims: (1) ineffective assistance of counsel at the sentencing phase; (2) the trial court erred by removing scrupled jurors during voir dire; (3) ineffective assistance of counsel during voir dire; (4) ineffective assistance of counsel for failing to object to the trial court's removal of scrupled jurors during *voir dire*; (5) failure to inquire into Keith's reasons for filing an affidavit of indigency; and (6) the cumulative effects of the above errors and omissions deprived Keith of his rights to effective assistance of counsel, a fair trial, and fair sentencing.

### A.  Ineffective Assistance of Counsel During the Sentencing Phase

Keith first argues that trial counsel rendered constitutionally ineffective assistance at the sentencing phase by (1) failing to conduct any mitigation investigation or defense; (2) requesting and permitting to be submitted to the jury a post-conviction psychological evaluation and a presentence report ("PSR"), both of which contained potentially damaging information; (3) failing to secure the services of a mitigation expert; and (4) failing to discuss mitigation with Keith before waiving the presentation of mitigation evidence.

Constitutionally ineffective assistance of counsel exists when "counsel's conduct so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Claims of ineffective assistance of counsel at sentencing are analyzed under the *Strickland* standard. *See Darden v. Wainwright*, 477 U.S. 168, 184 (1986). In order to demonstrate ineffective assistance, the petitioner must show that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687. Petitioner must prevail on both requirements, and the court may analyze the requirements separately and in any order. *Id.* at 697. Because this case is governed by AEDPA's standard of review, only Supreme Court cases already issued at the time of the relevant state court decision can offer guidance regarding whether counsel's performance was ineffective. *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).

### 1.  Failure to conduct mitigation investigation or present mitigating evidence.

Keith claims that his attorney, Banks, failed to conduct any mitigation investigation. He presented affidavits from his family that Banks would not speak to them unless they paid him for his time, and there is no evidence on the record that, other than requesting the psychological report or PSR, Banks did conduct any investigation. In post-conviction proceedings, Keith presented affidavits attesting that he had a distant relationship with his attorney and lacked knowledge about the mitigation phase, that counsel did not interview Keith's family members, that friends and family praised his abilities in high school football and his relationship with his daughter and nieces, and that a forensic and neuropsychological consultant opined that Keith might suffer from a mild brain impairment. Keith also presented evidence that his mother was a drug addict, that he was mostly raised by his grandparents, that his grandmother was a convicted murderer, and that his father was "known to gamble and run the streets."

Even assuming that Keith's counsel was deficient, Keith's claim fails because he cannot show prejudice under *Strickland*. The case against Keith was strong. He committed multiple

murders, his victims included children, there was significant evidence of premeditation, and the murders were for revenge or to silence witnesses. The additional mitigating evidence, even taken all together and presuming the prosecution would not have been able to rebut or reinterpret any of it, does not demonstrate that Keith's life had been so terrible that he was materially less culpable. In addition, as the state courts noted, much of the so-called additional information was already given to the jury in the PSR, including descriptions of Keith's family history and childhood circumstances. The added suggestion that Keith might have a minor brain dysfunction and additional information about his disadvantaged childhood would have been insufficient to sway the jury. Therefore, the Ohio Supreme Court's conclusion that Keith was not prejudiced by any alleged deficiencies of his counsel at sentencing is not contrary to or an unreasonable application of federal constitutional law.

Keith also relies on the recent Supreme Court decision in *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2546 (2005). In that case, the Court found ineffective assistance at sentencing because Rompilla's attorneys failed to look at a prior conviction file they knew existed, and which they knew the prosecution was going to use to show aggravating circumstances. The Court did not hold, as Keith claims in his supplemental memorandum, that "counsel must independently investigate mitigating evidence in a capital defendant's background," but rather that counsel must investigate evidence it knows the state will use against defendant. 125 S. Ct. at 2468. Here, the State produced no aggravating evidence beyond that which was brought out in the guilt phase. The entire sentencing phase consisted of the judge asking both parties if they had any evidence and both attorneys waiving presentation of evidence. *Rompilla* does not compel reversal in this case.

## 2. The psychological report and the PSR.

Next, Keith asserts that counsel rendered ineffective assistance by permitting the jury to see the PSR and a psychological evaluation report that contained negative information that was both new to the jury and otherwise inadmissible. On the one hand, the PSR contained some information detrimental to Keith, such as victim impact information, information about prior incidents between Rudel Chatman (the brother of the victim Marichell Chatman) and Keith, and information about Keith's non-violent criminal record. On the other hand, the PSR demonstrates that Keith did not have a history of violence, had maintained employment, and had been progressing well on parole. Defense counsel could have reasonably concluded that this favorable information made it worthwhile to admit these reports.

Keith's reliance on *State v. Huertas*, 553 N.E.2d 1058, 1062-63 (Ohio 1990), is misplaced. In that case, the court reiterated the conclusion of the Supreme Court in *South Carolina v. Gathers*, 490 U.S. 805, 810 (1989), that the submission of victim impact statements to juries in capital trials was unconstitutional. That holding has since been explicitly overruled in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), which held that the Eighth Amendment is not a per se bar to the submission of victim impact statements. There is thus no constitutional basis for concluding that the admission of the victim impact information was per se error.

As for the psychological report, Keith complains that it was based entirely on the indictment and a one-hour post-conviction interview during which no psychological tests were conducted. The report contained details about Keith's criminal record, his recreational use of marijuana, and his lack of a personal or family history involving mental illness or alcoholism. But the report also notes that Keith was pleasant and cooperative, that he did not have trouble with controlling his temper, that he was able to hold a job, that prior to his arrest he had plans for opening a store, and that he considered himself likeable and gentle. Again, defense counsel could reasonably have concluded that this positive information could benefit Keith.

Keith then argues that he was prejudiced by errors in the reports. The Ohio Supreme Court found that counsel's decision to permit these reports to be submitted to the jury did not meet the *Strickland* standard for ineffectiveness or prejudice, stating:

> Although the psychological report and the presentence investigation report did contain some errors, these errors were not prejudicial.[1] The trial court corrected the minor errors in the presentence investigation report. . . . Additionally the psychological report contained some evidence of mitigation, including references to appellant's family background, work history, and personal interests that the jury would not have otherwise had available to it.

*Keith*, 684 N.E.2d at 67 (footnote added). Because these errors were corrected by further instructions from the trial judge, we cannot say that this conclusion by the Ohio Supreme Court was unreasonable.

Given that the reports did contain some mitigating information and given the strength of the case against him, Keith cannot show that the alleged errors by counsel prejudiced the jury. Thus, the state court's rejection of this issue was neither contrary to nor an unreasonable application of federal constitutional law, nor was it an unreasonable determination of the facts in light of the evidence presented.

### 3. Failure to request a mitigation expert.

Keith also complains that counsel was ineffective by failing to request the assistance of a mitigation expert. However, he offers no suggestion as to how the services of an expert would have altered the outcome of the sentencing proceedings. Instead, Keith merely cites the fact that counsel failed to seek a ruling from the court that he was indigent. The court is not obligated to speculate about how a mitigation expert might have swayed the jury, especially because the mitigating evidence Keith now presents is not substantial.

### 4. Waiver of mitigation.

Keith claims in an affidavit that he did not know what mitigation was until he arrived in prison, that his attorney, Banks, never consulted with him, and that, if he had, Keith would have wanted to present mitigating evidence. This claim fails for lack of prejudice, and because an otherwise constitutionally ineffective strategy is not a grounds for habeas relief if the client knowingly directed the strategy. *See Coleman v. Mitchell*, 268 F.3d 417, 448 (6th Cir. 2001). The Ohio Supreme Court found that Keith had expressly waived the presentation of mitigating evidence, *Keith*, 684 N.E.2d at 67 ("counsel's failure to present mitigating evidence was not a demonstrably deficient trial strategy in light of appellant's decision to waive such a presentation."), and we have already determined that trial counsel's strategy on mitigation does not support habeas relief under the *Strickland* standard regardless of Keith's consent or lack thereof. *See supra* p. 6.

### B. Exclusion of Scrupled Jurors

Keith's second claim is that the state trial court erred by excluding all the jurors who expressed reservations about recommending a sentence of death ("scrupled jurors") from the venire without sufficiently inquiring into whether their views would prevent or substantially impair their proper performance as impartial finders of fact, thus violating his rights under the Sixth and Fourteenth Amendments. Specifically, Keith objects to the exclusion of three prospective jurors,

---

[1]Most of the errors were mistakes on dates, which the judge corrected during jury deliberation.

Cotsamire, Oberlander, and Hoffman,[2] who responded to the court's question, "In a proper case if the facts warrant it and the law permits it, could you join in signing a verdict form which might recommend to the court the imposition of the death penalty?" by expressing some doubt about their ability to do so.

Keith contends that further inquiry might have rehabilitated those prospective jurors and that their dismissal "stacked the deck" in favor of a death sentence. Because the state court's procedure was contrary to the Supreme Court's holdings in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (establishing standards for determining whether prospective jurors may be excluded for cause based upon their views on capital punishment), and *Wainwright v. Witt*, 469 U.S. 412 (1985) (same), Keith argues, the rule in *Gray v. Mississippi*, 481 U.S. 648, 668 (1987), makes harmless error review inappropriate for this error. Keith notes that the facts in his case are "reminiscent" of *Gray* and that the wrongful exclusion of even a single juror renders a death sentence violative of his constitutional rights. However, our treatment of this claim is complicated both by the failure of Keith's trial counsel to object to the dismissals and the fact that *Gray* was before the Court on direct, and not collateral, review. We take careful note that *Gray* has never been extended to the context of procedural default of a claim in a petition for habeas corpus. Nor has failure of counsel to lodge a *Gray* objection ever been held to constitute automatic ineffectiveness of counsel. Rather, in these two contexts, other well-developed rules for analysis of prejudice already apply.

In order for procedural default to apply, (1) there must be a firmly established state procedural rule that is applicable to the petitioner's claim and the petitioner must not have complied with the rule; (2) the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the federal claims; and (3) the procedural default must be an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. *Lancaster*, 324 F.3d at 436-37; *Maupin v. Smith*, 785 F.2d 135, 138-39 (6th Cir. 1986).

Keith failed to adhere to the firmly-established Ohio contemporaneous objection rule, which is an independent and adequate state ground that the Ohio Supreme Court invoked as the basis for its decision to apply plain error review only. *Keith*, 684 N.E.2d at 55. *See Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000) (recognizing Ohio's contemporaneous objection rule as an adequate and independent state ground). Keith's attorney failed to object to the dismissal of the scrupled jurors without further inquiry. The Ohio Supreme Court, recognizing this, conducted plain error review of the issue. The court found no error, and instead deferred to the trial judge's assessment of the prospective jurors. Furthermore, the court held that "[e]ven assuming there was error, given the absence of an objection, the error is not a plain one; that is, the outcome of the trial would not have clearly been different absent the error." *Keith*, 684 N.E.2d at 56. Moreover, the Ohio Supreme Court's plain error review does not constitute a waiver of the state's procedural default rules and resurrect the issue for Keith. *See Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Consequently, this issue has been procedurally defaulted.

Absent cause and prejudice, a federal court may not reach the merits of claim that has been procedurally defaulted in state court. *Reed v. Farley*, 512 U.S. 339, 354-55 (1994). In the habeas corpus context, absent a miscarriage of justice, the cause and prejudice test is applicable in all cases where a state prisoner has failed to comply with an independent and adequate state procedural rule,

---

[2]Keith also objects to the exclusion of Jaynes and Perkey. However, they were interviewed only as potential alternate jurors, and no alternate jurors were needed. Keith could not be prejudiced by the erroneous exclusion of alternate jurors when there is no possibility those jurors could have been called to serve on the jury. *See Ross v. Oklahoma*, 487 U.S. 81, 87 (1988) (noting that *Gray* "is too sweeping to be applied literally" and that there is no error where a prejudiced juror did not ultimately sit on the jury).

thus causing him to have previously defaulted his federal claims in state court. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("*In all cases* in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.") (emphasis added). Although we find that the question of cause, i.e., whether counsel's failure to object was outside the wide range of reasonableness of trial strategy, may be a close question, *see Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000) (ineffective assistance of counsel will suffice to constitute cause), Keith clearly cannot demonstrate prejudice resulting from his default.

In light of this difficulty, Keith argues that *Gray* must be extended to obviate any requirement for him to demonstrate prejudice resulting from his procedural default. This argument fails for several reasons. First, *Gray* has never been so extended, by the United States Supreme Court or any federal court of appeals. *See Brown v. Lambert*, 431 F.3d 661, 666 (9th Cir. 2005) (granting habeas because prejudice is presumed in properly preserved *Gray* error); *Jones v. Dretke*, 375 F.3d 352, 356 (5th Cir. 2004) (recognizing the narrow applicability of *Gray*), *cert. denied*, 543 U.S. 1060 (2005); *Szuchon v. Lehman*, 273 F.3d 299, 326–27 (3d Cir. 2001) (considering a *Witherspoon/Gray* claim on habeas where the state's procedural bar was not firmly established); *Gall v. Parker*, 231 F.3d 265, 332 (6th Cir. 2000) (granting a conditional writ of habeas corpus and noting that *Gray* error is not subject to harmless error analysis where the claim was not procedurally defaulted); *United States v. Simmons*, 961 F.2d 183, 185 & n.1 (11th Cir. 1992) (distinguishing *Gray* and applying plain error review to a procedurally defaulted claim that jurors were impartial), *cert. denied*, 507 U.S. 989 (1993). *See also Payne v. Tennessee*, 501 U.S. 808, 852 n.2 (1991) (Marshall, J., dissenting) (placing *Gray* on an "endangered precedents" list). Given these facts, the Ohio Supreme Court can hardly be labeled as unreasonable under AEDPA for failing to do so.

Keith argues that our decision in *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001), where we presumed prejudice when a clearly biased juror was seated on a jury, should, by analogy, apply here as well. In *Hughes*, the petitioner stole property, including a gun, from a Deputy United States Marshal. *Id.* at 455. During *voir dire*, a juror who was eventually *seated*, when asked if she could be fair to the defendant, answered "No." *Id.* at 456. Clearly, Keith's situation is not analogous to *Hughes*—not seating the scrupled jurors here tells us nothing about the jurors who were in fact chosen. Seating a juror who has clearly stated her partiality is *not* analogous to the rejection of jurors who *may be* impartial. Thus, *Hughes* does not support Keith's argument for an extension of *Gray*.

Most importantly, we find that an extension of *Gray* requiring automatic reversal of state court decisions through habeas corpus petitions ignores fundamental differences between direct and collateral review in our system of dual sovereigns. The *Gray* plurality was speaking in a context where the alleged error was before the trial judge and the structural error was sought to be corrected through direct review. The procedural disposition of Keith's claim makes *Gray* inapplicable. The argument for extension of *Gray* is weakened, not because the issue is any less important, but because considerations of federalism and respect for the state trial process demand that it be so. "The procedural default doctrine and its attendant 'cause and prejudice' standard are 'grounded in concerns of comity and federalism,' and apply alike whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter*, 529 U.S. at 451 (citations omitted). When a federal court vacates the judgment of a state trial court, a showing of actual prejudice is required to insure that defaulted claims are considered only when they will have made a difference.

When we consider all of the circumstances of this case: the equivocal nature of the responses of the scrupled jurors on *voir dire*, the government's surplus of unused peremptories, the lack of a pattern of removing all scrupled jurors, and the highly prejudicial circumstances

surrounding this execution-style multiple murder, we conclude that the district court did not clearly err in finding as a matter of fact that there was no prejudice here sufficient to undermine a belief in the fairness of the trial. *See Keith v. Mitchell*, No. 99-657, slip op. at 17, 43 (N.D. Ohio June 14, 2001). Thus, Keith's procedural default cannot be excused, and the exclusion of the scrupled jurors cannot be examined on the merits. We conclude that Keith's challenge to the exclusion of the scrupled jurors is barred from federal habeas review by his procedural default of the issue in the state courts.

Finally, we note that this is not "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Keith does not claim that he is actually innocent. The aggravating circumstances in this case were extremely compelling and, even assuming constitutional error, the exclusion of the scrupled jurors did not so unfairly affect the proceedings as to result in the improper imposition of the death penalty. Moreover, the Ohio Supreme Court's independent review of the case mirrored the jury's finding that the aggravating circumstances clearly outweighed any mitigating circumstances and warranted the death penalty. *See Keith*, 684 N.E.2d at 68-70; *see also Stanford v. Parker*, 266 F.3d 442, 455 (6th Cir. 2001) ("As is required pursuant to Ky. Rev. Stat. Ann. § 532.075, the Kentucky Supreme Court reviewed Stanford's death sentence on direct appeal and determined that the death sentence was supported by the evidence, i.e., the balance of aggravating and mitigating circumstances warranted death. [citation omitted] Stanford's trial was fundamentally fair and counsel's failure to life-qualify the jury did not undermine the reliability of and confidence in the result.").

### C. Ineffective Assistance of Counsel During *Voir Dire*

Keith raises his counsel's failure to object to the exclusion of the scrupled jurors in a second context. He claims that counsel's failure constituted ineffective assistance of counsel and that this denied him his constitutional right to a fair trial. This issue was preserved below, and was addressed by the state courts and the federal district court on its merits. Here, our standard is the familiar *Strickland* standard; that the deficient performance of counsel prejudiced the defendant and deprived him of a fair trial. *See* 466 U.S. at 687. For the reasons set out above and expanded on below, we affirm the district court's decision that the rulings of the Ohio Supreme Court did not warrant habeas relief, under the standards of AEDPA.

Keith alleges that trial counsel rendered ineffective assistance by 1) failing to conduct meaningful *voir dire* generally, and 2) failing to object to the state trial court's action removing scrupled jurors for cause, the same grounds we considered above. *See supra* Part II.B. He argues that his counsel should have objected to the trial judge's removal of some of the scrupled jurors and that his counsel did not adequately question jurors to insure an impartial jury.

Counsel, like the trial court, is granted "particular deference" when conducting *voir dire*. *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). "'An attorney's actions during *voir dire* are considered to be matters of trial strategy . . . . A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'" *Miller v. Webb*, 385 F.3d 666, 672-73 (6th Cir. 2004) (quoting *Hughes*, 258 F.3d at 457). Nonetheless, "[d]espite this strong presumption that counsel's decisions are based on sound trial strategy, . . . '[t]he trial strategy itself must be objectively reasonable.'" *Miller*, 385 F.3d at 673 (quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001)).

### 1. Failure to conduct meaningful *voir dire*.

Keith complains that his counsel's repeated questions about jurors' religious beliefs was "seriously unprofessional." We believe, however, that read in context of the entire *voir dire*, Keith's

counsel does appear to have been pursuing a consistent and reasonable strategy. As in *Stanford*, 266 F.3d at 454–55, it is apparent that trial counsel's conduct during *voir dire* in Keith's proceeding did not "permeate[] the entire trial with obvious unfairness." *Miller*, 385 F.3d at 673. Defense counsel exercised peremptory challenges against those prospective jurors who expressed particularly strong religious beliefs. For instance, defense counsel inquired into a subsequently excused juror's religious beliefs by asking how long he had been Catholic. When the juror responded, "All my life," defense counsel may reasonably have felt that this indicated a more socially and politically conservative juror who would be less hesitant to impose the death penalty. Defense counsel was also quite active during *voir dire*, and exercised his entire initial allotment of peremptory challenges. In fact, he twice requested additional peremptory challenges. Thus it was not unreasonable for the Ohio Supreme Court to determine that defense counsel was pursuing an objectively reasonable *voir dire* strategy that he believed would empanel the best possible jury. 684 N.E.2d at 55.

Even if we assume counsel's *voir dire* strategy to be objectively unreasonable, Keith must still demonstrate prejudice to prevail on his ineffective assistance of counsel claim. In other words, he must show that counsel's failure to conduct more comprehensive *voir dire* substantially undermined the fairness of the trial. This court has previously shown deference to counsel's conduct of *voir dire* in light of trial counsel's failure to ask specific questions:

> Under *Strickland's* prejudice prong, Stanford's counsel's failure to ask life-qualifying questions during general voir dire did not constitute ineffective assistance of counsel. First, there is no evidence that any potential jurors were inclined to always sentence a capital defendant to death. Second, nothing in the record indicates that counsel's failure to ask life-qualifying questions led to the impanelment of a partial jury. Third, considering the totality of the evidence, there is no reasonable probability that, even if defense counsel erred, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *See Strickland*, 466 U.S. at 695. . . . Stanford's trial was fundamentally fair and counsel's failure to life-qualify the jury did not undermine the reliability of and confidence in the result.

*Stanford*, 266 F.3d at 455.

Keith has not shown what our precedents require: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," where a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. 694. Instead, he relies on *Gray's* presumption of prejudice—labeling Banks's *voir dire* "not meaningful" and failing to offer any alternative. We are satisfied that even Keith's hypothetical jury, selected through a different set of questions, when seated, would also have imposed the death penalty in this case. Given the extremely brutal and callous circumstances of these multiple murders, the district court did not err in finding that there was not a "reasonable probability" of a difference in outcome based simply on the possible seating of one or more of these scrupled jurors.

## 2. Failure to object to the removal of the scrupled jurors.

Keith argues that his counsel specifically erred by failing to object to the trial judge's removal of the three scrupled jurors. The argument supporting this point merely repeats those made in the claim that the trial judge should not have excluded three of the scrupled jurors.

First, as discussed above in Part II.C.1, there is little indication that defense counsel was constitutionally ineffective during *voir dire*. Like the court, Keith's defense counsel observed the demeanor of the potential jurors and had access to additional information from each of their

questionnaires. He actively questioned all the prospective jurors. The fact that one prospective juror, whom Banks felt had expressed hesitation about the death penalty, was eventually placed on the jury demonstrates that Banks's performance was not objectively unreasonable. Juror Candice Bores responded to the trial judge's question of whether she could join in recommending the death penalty by stating that she could only if she "was totally sure and had no doubts." The record reflects the court's recognition of her continuing hesitation during follow-up questions. Bores's selection undermines Keith's argument that any other impartial jury would have reached a different result.

In addition, Keith cannot show *Strickland* prejudice from his counsel's failure to object. In the absence of any evidence that a different set of unbiased jurors would have had a "reasonable probability" of a different result, any erroneous exclusion of an impartial juror was harmless because we have every reason to believe the replacement was also an impartial juror. Keith does not dispute that he was convicted and sentenced by an impartial jury, and he presents no reason to think that a jury composed of a slightly different set of impartial jurors would have reached a different verdict or sentence.

### D. The Affidavit of Indigency

Keith next complains that his rights to counsel and due process were violated when the state trial court failed to make sufficient inquiry on the record regarding his filing of an affidavit of indigency and request for appointed counsel, thereby forcing Keith to trial without the effective assistance of counsel. He argues that his inability to pay counsel the fees demanded adversely affected counsel's representation of him. He further argues that his affidavit of indigency alone, filed three weeks after arraignment and two months before trial, was sufficient to trigger a duty on the part of the trial court to inquire as to his financial status and his satisfaction, or lack thereof, with his retained counsel.

Keith retained Banks as his attorney prior to his arraignment. Three weeks later, Keith decided or realized that he would be unable to pay Banks's fee, and he filed an affidavit of indigency. Contrary to the claims of Petitioner, the affidavit did not ask for appointment of counsel. It read,

> I, Kevin Keith . . . , affiant herein . . . , does hereby depose and say: That I am without the necessary funds with which to pay for the costs of an Attorney and that I am without any possession, real or personal of sufficient value . . . with which to offer as security for such costs, and that I am a true indigent and pauper within the meaning of the law.

There was no record of a pretrial inquiry into Keith's affidavit, but in a post-trial Judgment Entry, the trial court judge stated:

> Why wasn't there any action taken on Kevin Keith's affidavit of indigency which he filed with the Court? It was explained that this affidavit of indigency and request for appointment of counsel was filed without the knowledge of Defendant's attorney, James Banks. In fact there is some question as to whether or not Kevin Keith actually signed this affidavit as he was incarcerated and the notary was interviewed and claimed that she did not notarize this for Kevin Keith. Mr. Banks also indicated that if the Defendant backed out of his fee arrangement he would pursue this matter at no cost to the county because he felt it was his obligation. The Court recalled specifically asking the Defendant i[f] he agreed to proceed with his attorney and he offered no objection. As the Court explained to the appellate attorneys, it does not recall whether or not this was on the record during any of the proceedings, however,

> this Court specifically remembers the look on Defendant's face when the Court asked him the question.

The Ohio Supreme Court considered and rejected this asserted error on direct appeal, noting that the affidavit itself expressed no dissatisfaction with Banks's representation, but merely stated that Keith was without sufficient funds to pay counsel. *Keith*, 684 N.E.2d at 58-59. Once Banks agreed to waive his fee if necessary, that problem was eliminated.

This claim is not cognizable on habeas because Keith relies upon state procedural rules and state case law to support his assertion that the state trial court should have, upon receiving the affidavit, inquired into his satisfaction with his attorney. *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004), *cert. denied*, 531 U.S. 1157 (2005), (an issue raising solely a violation of state law or procedure is not cognizable under § 2254); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (federal claim must have been adequately presented to the state courts). The federal cases Keith cites are, as the district court observed, "marginally relevant" and require, at a minimum, that the defendant must show some dissatisfaction with his attorney's performance in order to trigger the inquiry Keith wants. *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) ("We affirm the general principle that a district court usually must engage a defendant in person where he has expressed dissatisfaction with counsel and has sought to have him removed. In this case, however, the defendant never indicated that this was necessary. We think it clear that at a minimum 'the defendant must show his hand. . . .' Since the district court was not put on notice that Iles was dissatisfied with counsel and wished to have him removed or to have new counsel, the district court had no duty to inquire.") (citations omitted).

Thus, to the extent that this claim is properly cognizable under habeas, it fails because the affidavit failed to give the judge the required indication that Keith was dissatisfied with Banks or even that he wanted counsel to be appointed for him if Banks refused to serve without pay. Rather, the affidavit simply stated that Keith could not pay Banks, a problem that was solved when Banks agreed to represent Keith *pro bono* if necessary.

### E. Cumulative Effect of Trial Counsel's Errors

Finally, Keith argues that the cumulative effect of counsel's errors deprived him of a fair trial and entitle him to habeas relief. The State asserts that this claim was not exhausted in the state courts and is therefore barred from federal habeas review. Alternatively, the State argues that the claim is without merit.

Because Keith did not raise his claim of cumulative error in the state courts, it is procedurally defaulted. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Furthermore, "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (*citing Lorraine*, 291 F.3d at 447); *see also Millender v. Adams*, 376 F.3d 520, 529 (6th Cir. 2004), *cert. denied*, 544 U.S. 921 (2005). Finally, because the individual claims are all essentially meritless, Keith cannot show that the cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

### III

For the foregoing reasons, we **AFFIRM** the district court's denial of Keith's petition for habeas corpus.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. While I concur in Parts II.D and II.E of the majority's opinion, pertaining to Petitioner's affidavit of indigency and the cumulative error claims respectively, I dissent from Parts II.A and II.C. I would instead hold that Petitioner received ineffective assistance of counsel during both the mitigation phase of trial and *voir dire* and accordingly grant habeas relief from the sentence of death imposed upon Petitioner. Additionally, I concur with the result of Part II.B., rejecting Petitioner's claim that the trial court erred in dismissing scrupled jurors during *voir dire*, but not its rationale. In contrast to the majority, I see no reason to hold that *Gray v. Mississippi*, 481 U.S. 648 (1987), does not apply to cases on collateral review, and would instead simply hold that the trial court did not abuse its discretion in excusing the scrupled jurors. Accordingly, I would vacate Petitioner's sentence but uphold his conviction.

**I.**
**Ineffective Assistance of Counsel in the Mitigation Phase**

Despite a long and well-recognized line of Supreme Court case law requiring counsel in death penalty cases to conduct at least a cursory investigation into mitigation evidence, it is uncontested in this case that defense counsel failed to conduct *any* investigation. Instead, defense counsel submitted reports containing information that any reasonable attorney would recognize could only prejudice a defendant, including: (1) victim impact information; (2) an extensive list of evidence implicating Petitioner; (3) a record of Petitioner's prior convictions; (4) erroneous positive statements about Petitioner's family and childhood; and (5) a psychiatrist's report stating that Petitioner was not mentally impaired and that no mitigating factors existed. It cannot be reasonably argued that submitting such information was a legitimate strategy simply because the report also mentioned that Petitioner was a good football player and considered himself a nice guy. Therefore, I would hold that Petitioner received ineffective assistance of counsel during the mitigation phase of his trial, requiring vacation of his death sentence.

**A.     Counsel's Conduct During the Mitigation Phase**

The following facts regarding the performance of Petitioner's counsel during the mitigation phase are not disputed. Mr. Banks, counsel for Petitioner, did not discuss the concept of mitigation with Petitioner. He did not question Petitioner about his life or childhood. He did not interview Petitioner's family or friends, despite their expressed willingness to speak with him. At the hearing, he presented no opening statement, witnesses or closing statement. He did not argue innocence, residual doubt, or even ask the jury to spare Petitioner's life. Furthermore, he allowed the submission of two highly prejudicial reports he had requested the court to prepare prior to the hearing.

The first report contained the results of a one hour examination of psychologist Dr. Schonberg. It noted, among other things, that Petitioner did not appear to have any mental illnesses, was of average intelligence, and was not currently depressed, or "down in the dumps." (Schonberg Rep. at 2.) It also recounted Petitioner's statements that he was a nice guy, had no anger problems, and did not have a significant substance abuse problem. Further, the report stated that Petitioner's family had no history of alcoholism, and that Petitioner was never physically or sexually abused. Finally, Dr. Schonberg concluded:

Under the provisions of the Ohio Revised Code, Section 2929.04; Criteria for Imposing Death or Inprisonment [sic] for a Capital Offense, the death penalty will be precluded if the Court found any of three mitigating circumstances. [Petitioner] states that he is innocent of these charges. It would not appear that the offender acted under duress, nor would it appear that the victim of the offense induced or facilitated it. The offense would not appear to have been a product of the offender's mental deficiency or psychosis, the client having no psychiatric history. Therefore, based on interview impressions, it is this examiner's opinion that there are no mitigating factors in this case.

(Schonberg Rep. at 3.)

The second report was a pre-sentence report. It contained: (1) three pages recounting the crime and evidence against Petitioner; (2) a page long victim impact statement including information regarding the psychological state and monetary troubles of the surviving victims and their relatives; (3) a one sentence section labeled "Defendant's version" that included Petitioner's claim of innocence; (4) a one page history of Petitioner's prior record; (5) a two page summary of Petitioner's parole and supervised release history; and (6) a one page social history of Petitioner. The social history stated that Petitioner was an illegitimate child who was raised by his grandparents and had a happy and normal childhood. It also stated that Petitioner maintained employment and had a daughter for whom he paid $25 dollars per week in child support.

After the jury recommended sentencing Petitioner to death, Petitioner's post-conviction counsel uncovered relevant mitigating evidence. Post-conviction counsel submitted affidavits indicating that Petitioner's mother was an alcoholic who drank during her pregnancies, that Social Services had determined that Petitioner's mother neglected him and had placed him with his grandparents, that Petitioner's grandfather had abused at least one of Petitioner's half-siblings and probably had abused the other children, presumably including Petitioner, and that Petitioner's custodial grandmother was a convicted murderer. Additionally, counsel submitted an affidavit from a Dr. Smalldon stating that Dr. Schonberg's report was inadequate and unprofessional. In particular, Dr. Smalldon critized Dr. Schonberg's willingness to accept Petitioner's statements about his life at face value and draw such broad conclusions from an hour long interview. Further, Dr. Smalldon opined that Petitioner may suffer from a mild brain impairment. Unfortunately, post-conviction counsel was not able to fully develop this evidence due to the post-conviction trial court's refusal to allow a hearing.

## B.     The Ohio Courts' Treatment of Counsel's Conduct

Despite the conduct of counsel and evidence suggesting that Petitioner's childhood was not as "happy and normal" as reported in the pre-sentence report, PSRI at 8, all of the Ohio courts determined that counsel's decision to forgo the presentation of mitigation evidence was "strategic." *See State v. Keith*, 684 N.E.2d 47, 67 (Ohio 1997); *State v. Keith*, No. 3-98-05 (Ohio App. 3 Dist. May 1998); *State v. Keith*, No. 3-94-13, 1996 WL 156710, *23 (Ohio App. 3 Dist. April 5, 1996); *State v. Keith*, No. 94-CR-0042 (Common Pleas Ct. of Crawford County Ohio Feb. 4 1998). They reasoned that mitigation evidence was inconsistent with Petitioner's claim of innocence at trial. Additionally, the Ohio Court of Appeals held that the evidence submitted in affidavit form by post-conviction counsel was merely duplicative of evidence contained in both Dr. Schonberg's report and the pre-sentence report. Thus, it held that counsel's failure to present mitigation evidence did not prejudice Petitioner.

## C. Standard of Review

As noted in the majority opinion, AEDPA governs this Court's review of the state court holding in this case. Under AEDPA, this Court may only reverse a state court holding if the holding was: "(1) contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under § 2254(d)(1) a state court decision is contrary to a clearly established Federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law, or if the if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 360, 413 (2000). A state court decision is an unreasonable application of clearly established Federal law if "the state court identifies the correct governing legal principle but unreasonably applies that principal to the facts of the prisoner's case." *Id.*

## D. Clearly Established Law on Ineffective Assistance of Counsel

The Supreme Court first articulated the now familiar two part test for determining whether counsel is ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984), and "[i]t is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 529 U.S. at 390. Under *Strickland*, a defendant seeking to establish that his counsel's assistance was ineffective must show: (1) that his counsel's performance was deficient, in other words, that it "fell below an objective standard of reasonableness;" and (2) that the defense was prejudiced by the attorney's deficient performance. *Strickland*, 466 U.S. at 687-88. In establishing prejudice, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case," but only, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

In *Strickland*, the Court dealt specifically with a claim that counsel's failure to investigate and present mitigation evidence constituted deficient performance. *Strickland*, 466 U.S. at 699. The Court explained that while strategic choices made after a through investigation "are virtually unchallengeable; . . . strategic choices made after a less than complete investigation are reasonably precise to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary." *Id.* at 690-91. Thus, it follows that any decision to forgo mitigation evidence is unreasonable if not made after a reasonable decision not to investigate further. *See id.*

The Supreme Court has now applied *Strickland* in the AEDPA context at least three times to hold that a defense attorney's failure to adequately investigate and present mitigating evidence at the sentencing phase of a death penalty trial constitutes ineffective assistance of counsel. *See Rompilla v. Beard*, — U.S. —, 125 S. Ct. 2546 (June 10, 2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams*, 529 U.S. at 390. In these cases, the Court has reiterated that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background" in death penalty cases. *Wiggins*, 539 U.S. at 522, 524 (citing ABA guidelines advising attorneys to conduct thorough investigations); *Williams*, 529 U.S. at 396. In this context, the Court has warned against a tendency to invoke "strategy" as a "*post-hoc* rationalization of counsel's conduct [rather] than an accurate description of their deliberations prior to sentencing" to explain counsel's decisions. *Id.* at 527.

**E.      The Ohio Courts' Decisions Were Contrary to and an Unreasonable Application of Clearly Established Federal Law**

The Ohio courts' denial of Petitioner's ineffective assistance of counsel claim was both contrary to and an unreasonable application of clearly established Federal law as articulated by the Supreme Court in *Strickland*.    Under *Strickland*, counsel's failure to present any mitigation evidence without first conducting an investigation is considered deficient performance.  466 U.S. at 691; *see Wiggins*, 539 U.S. at 523.  Thus, the Ohio courts' holding that Petitioner's counsel made a strategic decision not to present mitigation evidence despite his unreasonable failure to conduct any investigation is contrary to *Strickland*.  Similarly, the Ohio courts' determination that counsel's submission of the presentence report and Dr. Schoenberg's evaluation was reasonable trial strategy constituted an unreasonable application of *Strickland*.  Because the overwhelming majority of the reports contained information that was prejudicial as opposed to beneficial, counsel's decision fell below an objective standard of reasonableness as evidenced by prevailing professional norms.  Together, these errors prejudiced Petitioner because there is a reasonable probability that but for the errors one juror might have decided to sentence Petitioner to life, not death.

**1.      Counsel's Errors**

**a.      Failure to Investigate or Present Mitigation Evidence**

Counsel's complete failure to investigate before  deciding not to present mitigating evidence at sentencing is deficient performance as a matter of law under Supreme Court case law, and thus, the Ohio courts' determination that counsel did not err is contrary to Federal law as articulated in *Strickland*. *Wiggins*, 539 U.S. at 523; *Strickland,* 466 U.S. at 691.  The Ohio courts all determined that counsel's failure to present mitigation evidence was strategic.  They reasoned that presenting mitigation evidence was incompatible with a claim of innocence.  Putting aside the dubious proposition that mitigation and innocence are inconsistent, the Ohio courts' reasoning must be rejected because counsel's strategic decision not to present mitigation evidence is only protected under *Strickland* to the extent the decision followed a reasonable investigation. *Wiggins*, 539 U.S. at 523; *Strickland,* 466 U.S. at 691.   It is uncontested in this case that Mr. Banks conducted absolutely no investigation.  Therefore, his decision not to present mitigation evidence constituted deficient performance. *Wiggins*, 539 U.S. at 523; *Strickland,* 466 U.S. at 691.

**b.      Submission of Psychological and Pre-Sentence Reports**

Counsel's decision to submit the psychological and pre-sentence reports fell far below the standard of attorney conduct articulated in *Strickland*:   "reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  Thus, the Ohio court's holding to the contrary constitutes an unreasonable application of *Strickland*.

According to ABA guidelines, counsel in death penalty cases have an obligation to consider the strategic implications of requesting a pre-sentence report where such reports are optional.  ABA Guidelines, Death Penalty Cases, Guideline 10.12(A)(1); *Strickland*, 466 U.S. at 688 (stating that ABA standards are guides to prevailing professional norms); *see also Wiggins*, 539 U.S. at 524.  The commentary following Guideline 10.12 expressly notes that requesting such a report in Ohio may amount to ineffective assistance of counsel because it allows the prosecution to present a defendant's prior record and victim impact evidence, where such information would otherwise be inadmissible.  ABA Guideline 10.12 and accompanying commentary; Ohio Rev. Code § 2929.03(D) (stating that only a defendant may request reports).  Additionally,  Guideline 10.12 states that "counsel should . . . provide to the report preparer information favorable to the client [and] . . . take appropriate steps to ensure that improper, incorrect or misleading information that may harm the client is deleted from the report."

In this case, Mr. Banks conduct fell well below the standards set forth in ABA Guideline 10.12.  In the first place, considering the information contained in the reports, it is highly unlikely that Mr. Banks considered the strategic implications of placing the reports before the jury.  No reasonable defense attorney could actually read these reports and determine that there was anything to be gained by submitting them as evidence at the mitigation stage.  As discussed above,  the reports contained *pages* documenting Petitioner's prior record, impact on the victims and their families, evidence implicating Petitioner, erroneous statements about Petitioner's background and childhood, and a psychologist's conclusion that no mitigating factors existed.  In contrast, the report contained *one sentence* on Petitioner's version of the events.   Additionally, Dr. Schonberg's report stated that Petitioner was not depressed, which a jury could easily interpret as evidence of lack of remorse.   Finally, Dr. Schonberg also made the outrageous statement that no mitigating factors existed.  This is exactly what the jury, not Dr. Schonberg, was convened to determine.   No reasonable attorney could conclude that the mitigating value of the report outweighed the introduction of the prejudicial evidence simply because the report also contained a handful of positive sentences about the Petitioner.

The Ohio courts' determination to the contrary is an unreasonable application of *Strickland.* The Ohio courts found that the decision of counsel to submit the reports was "strategic."  *Strickland*, however, warns courts not to accept *post-hoc* rationalizations for counsel's conduct.  The Ohio courts' justification of counsel's conduct is just such a rationalization.  There is absolutely no support in the record evidencing that Mr. Banks considered the implications of submitting the reports.  Moreover, as explained above, counsel's decision, to the extent it was even a conscious decision, was not a reasonable strategy.

Next, there is no evidence that Mr. Banks made any effort to provide favorable information to the probation officer who prepared the pre-sentence report.  As will be discussed more thoroughly in the section below on prejudice, post-conviction counsel discovered relevant mitigation evidence that should have been presented at trial.  Mr. Banks failed to have this information included in the pre-sentence report.  Thus, the jury never heard the evidence.

Finally, Mr. Banks made no effort to insure that the information contained in the report was accurate.  Again, as will be discussed below, the reports submitted to the jury contained information that conflicted with information discovered by the post-conviction counsel.  Because of counsel's failure to correct the erroneous information, the jury received inaccurate and prejudicial information about Petitioner's life.

### 2.      Prejudice

Counsel's failure to present mitigating evidence and his submission of the psychological and presentence reports prejudiced Petitioner.  To demonstrate prejudice under *Strickland*, Petitioner must show that but for counsel's errors there is a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.  Under Ohio law, a jury verdict sentencing a defendant to death must be unanimous. *State v. Robb*, 723 N.E.2d 1019, 1044 (Ohio 2000).  Thus, to demonstrate prejudice in this case, Petitioner need only show that but for counsel's errors, *there is a reasonable probability that one juror would have voted differently.*

In this case, there is a reasonable probability that one juror would have spared Petitioner's life if the jury had not received Petitioner's prior record or the victim impact evidence contained in the reports and instead received mitigation evidence.  Under Ohio law, neither a defendant's prior record nor victim impact evidence is admissible to prove aggravation. *See* Ohio Rev. Code § 2929.04; *State v. Jackson*, 751 N.E.2d 946, 957 (Ohio 2001) (limiting aggravating factors to statutory aggravating factors that have been charged and proved beyond a reasonable doubt.  Thus, but for counsel's submission of the reports, the jury would not have had access to Petitioner's record

of the victims' trauma. *See* ABA Guideline 10.12 and accompanying commentary. Furthermore, the jury clearly considered Petitioner's prior record in its deliberations. The jury's prejudicial consideration of Petitioner's prior record is evidenced by a question the jury submitted to the court during its sentencing deliberations. The jury asked the court to verify the dates of Petitioner's imprisonment for a prior robbery. Petitioner's prior record very clearly affected the jury's deliberations, and thus, there is a reasonable probability that but for counsel's submission of the reports, one juror would have voted to recommend sentencing Petitioner to life imprisonment instead of death.

Had defense counsel acted as competent counsel, the jury would have heard mitigating evidence concerning Petitioner in place of the victim impact evidence and Petitioner's prior record. The jury would have known and been able to consider the information obtained by post-conviction counsel, namely, that Petitioner's mother was an alcoholic who drank during her pregnancies; that Social Services determined that Petitioner's mother neglected him and placed him with his grandparents; that Petitioner's grandfather abused at least one of Petitioner's half-siblings and probably abused the other children, presumably including Petitioner;[1] and that Petitioner's custodial grandmother was a convicted murderer. *See Rompilla*, 125 S.Ct. at 2468-69 (finding prejudice where evidence that Petitioner was abused and that his mother was an alcoholic was not presented at the mitigation hearing).

The majority's assertion that the mitigation evidence duplicated information already submitted to the jury through the reports is simply incorrect. First, Dr. Schonberg's report states that Petitioner's family had no history of alcoholism. In fact, Petitioner's mother admits that she was an alcoholic who drank while she was pregnant. Additionally, there is substantial evidence of drug abuse in Petitioner's family. Second, the reports do not state that Ohio Social Services found that Petitioner's mother was not fit to care for him. Instead, the pre-sentence report states, "[Petitioner] was raised by his grandfather . . . due to the fact that his mother was too young." This statement implies that Petitioner's mother voluntarily relinquished him to her parents and not that Social Services had to come and take him away.[2] Finally, Dr. Schonberg's report states that Petitioner was not abused. While it is not clearly established that Petitioner was abused, there is evidence suggesting abuse. This evidence could have been further developed if the post-conviction trial court had allowed post-conviction counsel to present evidence at a hearing.

In light of counsel's submission of extremely prejudicial evidence and counsel's failure to submit mitigation evidence, there is certainly *a reasonable probability* that but for counsel's errors *one juror* would have chosen to sentence Petitioner to life and not death.

## II.
## Ineffective Assistance of Counsel During *Voir Dire*

In addition to abdicating his duties during the mitigation phase of trial, defense counsel also rendered ineffective assistance during *voir dire*. Despite the ABA death penalty guidelines clear mandate that counsel should "develop a strategy for rehabilitating . . . [scrupled] jurors," Comments to Guideline 10.10.2., defense counsel utterly failed to even attempt to rehabilitate scrupled jurors. Given the equivocal nature of the scrupled jurors statements, a reasonable

---

[1] Although Petitioner informed Dr. Schonberg that he was not abused, Dr. Smalldon states in his affidavit that Dr. Schonberg's conclusions are not warranted in light of his brief meeting with Petitioner and that it was unprofessional to take what Petitioner said at face value.

[2] Additionally, it seems that the mitigation expert hired by post-conviction counsel was unable to obtain the Social Services file because there was no court order releasing it. It is unclear if post-conviction counsel requested a court order but the post-conviction trial court was clearly not interested in developing a factual record.

probability exists that defense counsel would have been able to successfully rehabilitate the jurors. Thus, counsel's failure prejudiced Petitioner under *Strickland,* 466 U.S. at 668, and *Gray v. Mississippi,* 481 U.S. 648 (1987), and the Supreme Court of Ohio's decision to the contrary was an unreasonable application of clearly established federal law. Counsel's failure to attempt to rehabilitate jurors provides an additional basis for vacating Petitioner's sentence of death because it led to a jury "organized to return a verdict of death." *Id.* at 68 (internal citations and quotations omitted).

## A.    Events at *Voir Dire*

During *voir dire* the district court asked all jurors, "In a proper case if the facts warrant it and the law permits it, could you join in signing a verdict form which might recommend to the court the imposition of the death penalty?" (J.A. at 1514.) Two jurors gave equivocal responses. First, Juror Barbara Costamire responded "that is bothering me." (J.A. at 1517.) The court asked "that is bothering you?," and she responded "yes," at which point the trial court excused her. (J.A. at 1517.) Second, Juror Julie Hoffman responded, "that would be an uncomfortable thing for me to do." The court then excused Julie Hoffman without any followup. (J.A. at 1519.) Counsel did not object to the trial court's exclusion of either juror or attempt to rehabilitate them.

## B.    Ohio Supreme Court Decision

The Ohio Supreme Court found that defense counsel's performance during *voir dire* was not ineffective within the meaning of the Sixth Amendment. Applying *Strickland*, 466 U.S. at 668, the court held that counsel did not render deficient performance because counsel's actions during *voir dire* are presumed strategic and because even if counsel's *voir dire* performance was deficient it did not prejudice Petitioner. The Ohio Supreme Court recognized that the Supreme Court's decision in *Gray v. Davis*, 481 U.S. 648 (1987), requires courts to presume prejudice when a trial court improperly excludes jurors with reservations on the death penalty, but declined to apply the presumption to counsel's errors, which resulted in a similar exclusion.

## C.    Standard of Review

Here, again our review of the Ohio Supreme Court's decision is limited by AEDPA. As discussed in the previous section, we may only overturn a state court determination on habeas review if the state court's holding was contrary to or an unreasonable application of clearly established federal law as articulated by the Supreme Court. 28 U.S.C. § 2254(d). A state court's failure to extend Supreme Court cases may constitute an unreasonable application of clearly established law. *Yarborough v. Alvarado,* 541 U.S. 652, 666 (2004).

## D.    The Ohio Supreme Court's Decision Was an Unreasonable Application of *Strickland* and *Gray*

The Ohio Supreme Court's determination that defense counsel did not render constitutionally ineffective assistance in failing to attempt to rehabilitate jurors is an unreasonable application of the Supreme Court's holdings in *Strickland* and *Gray*. As discussed in section I, under *Strickland*, a defendant seeking to establish that his counsel's assistance was ineffective must show: (1) that his counsel's performance was deficient; and (2) that the defense was prejudiced by the attorney's deficient performance. *Strickland*, 466 U.S. at 687-88. Here, counsel acted in a manner contrary to established professional norms by failing to attempt to rehabilitate jurors. Furthermore, his actions resulted in the exclusion of two jurors for whom a reasonable probability of rehabilitation existed. If such jurors had been rehabilitated, their exclusion would have been reversible error under *Gray*. Thus, it is unreasonable not to find prejudice under *Strickland* and *Gray*.

### 1.    Counsel's Failure to Attempt to Rehabilitate Constituted Deficient Performance

The majority relies much on *Strickland*'s presumption that an attorney's conduct is strategic unless proven otherwise.  The presumption of strategy is inappropriate in this case, however, because Petitioner has successfully rebutted it.[3]  In the instant case, Petitioner has submitted an affidavit from an experienced death penalty defender, Gerald Simmons.  According to Simmons, it is standard practice for a death penalty defender to attempt to rehabilitate scrupled jurors and to object to their exclusion.  In fact, Simmons states that it is "unacceptable" not to attempt to rehabilitate scrupled jurors or object to their exclusion.

Simmons statements are supported by the 2003 ABA Guidelines on Death Penalty Representation.[4]  Guideline 10.10.2 indicates that death penalty defenders should be familiar with techniques to life qualify the jury and rehabilitate scrupled jurors.  The commentary to 10.10.2 further explains:

> Counsel should conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, whether because they will automatically vote for death in certain circumstances or because they are unwilling to consider mitigating evidence.  Counsel should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty.

ABA Guideline 10.10.2, commentary; *see also Strickland*, 466 U.S. at 688 (noting that ABA guidelines reflect prevailing professional norms).  In light of Simmons' affidavit and the ABA guidelines, there is no reason for this Court to presume that counsel's conduct during *voir dire* was strategic.  In other words, counsel's failure to attempt to rehabilitate the scrupled jurors or object to their exclusion was objectively unreasonable in light of prevailing professional norms.

### 2.    Counsel's Failure to Attempt to Rehabilitate Prejudiced Petitioner

To establish that a defense attorney's failure to rehabilitate a scrupled juror was prejudicial in violation of the Sixth Amendment, a defendant must demonstrate that there is a reasonable probability that but for counsel's errors, the excluded juror would have been rehabilitated and thus not subject to exclusion under *Witherspoon* and *Witt*.  Because a reasonable probability existed that counsel's attempts to rehabilitate jurors Julie Hoffman and Barbara Costamire would have been successful, Petitioner has established prejudice.

---

[3]Petitioner's presentation of rebuttal evidence distinguishes this case from *Sanford v. Parker*, 266 F.3d 442 (6th Cir. 2001)*,* on which the majority relies.  In *Sanford,* which was not a Supreme Court case, and thus less persuasive in our AEDPA review, this Circuit held that an attorney's failure to "life qualify" the jury in a death penalty case did not constitute deficient performance under *Strickland*.  266 F.3d at 454.  There, this Court noted that "[the petitioner] present[ed] no evidence to rebut the presumption that counsel's failure to ask life-qualifying questions during general *voir dire* constituted trial strategy." *Id*.  Furthermore, it is questionable whether it makes sense to apply a presumption that an attorney's conduct is strategic in cases like the one at bar, in which counsel is admittedly not qualified to represent his client under the law of the relevant jurisdiction.

[4]Although the guidelines were complied in 2003, many years after Bank's conduct at *voir dire*, the guidelines are primarily a summary of existing practice and rely on numerous sources that predate Bank's conduct. Eric M. Freedman, Introduction to '*The Guiding Hand of Counsel': ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31(4) Hofstra L.R. 903, 903 (2003); *see also Hamblin v. Mitchell*, 354 F.3d 482, 486-87 (6th Cir. 2003) (holding that the 2003 guidelines essentially codify norms applied to cases in the 1980s).

### a. Improper Exclusion of Juror Under *Witherspoon* and *Witt* is Presumed Prejudicial

A juror may not be excluded under *Witherspoon* unless the juror's views on the death penalty "prevent or substantially impair the performance of his duty as juror in accordance with instructions and oath." *Witt,* 469 U.S. at 424; *Adams v. Texas,* 448 U.S. 38, 45 (1980). A juror's mere reservations or scruples regarding the death penalty are not a valid ground upon which a trial court may exclude a juror. *Id.* Where a trial court improperly excludes a juror under *Witherspoon* for the juror's mere reservations or scruples, the trial court's error is presumed prejudicial and the death sentence must be reversed. *Gray,* 481 U.S. at 667-668. The improper exclusion of even one qualified juror under *Witherspoon-Witt* may result in a jury more likely than the average jury to impose death, thus rendering the jury partial. *Id.* As the Supreme Court explained in *Gray,*

> Because the *Witherspoon-Witt* standard is rooted in the constitutional right to an impartial jury and because the impartiality of an adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error analysis cannot apply. We have recognized that "some constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error." The right to an impartial adjudicator, be it judge or jury, is such a right. As stated in *Witherspoon*, a capital defendant's constitutional right not to be sentenced by a tribunal organized to return a verdict of death surely equates with a criminal defendant's right not to have his culpability determined by a tribunal organized to convict.

*Id.* (internal quotation marks and citations omitted).

### b. *Strickland*'s Reasonable Probability Standard

As discussed above, *Strickland* requires a defendant to show that there is a reasonable probability that the outcome would have been different. 466 U.S. at 694. *Gray* instructs courts to presume the outcome would have been different where a juror is excluded under *Witherspoon* and *Witt*. 481 U.S. at 668. Therefore, it must follow that if Petitioner can show that there is a reasonable probability that a juror could not have been properly excluded under *Witherspoon*, this Court must presume that there is a reasonable probability that the outcome would have been different.

### c. Petitioner Has Shown A Reasonable Probability

Here, Petitioner has satisfied this burden. Petitioner has shown that there is a reasonable probability that his defense counsel could have successfully rehabilitated two of his jurors, Julie Hoffman and Barabara Costamire. Neither juror clearly stated that they were incapable of imposing the death penalty but only that its imposition would "bother" them or make them "uncomfortable." There is nothing else in the record to indicate that Hoffman and Costamire could not have imposed the death penalty despite the discomfort it might have caused them. While the trial court might have acted within its discretion in excluding them in lieu of these statements, it seems likely that defense counsel could have rehabilitated them. That is, in light of the equivocal nature of the statements of Hoffman and Costamire, there is a reasonable probability that defense counsel could have successfully shown that although Hoffman and Costamire had reservations about the death penalty, they were capable of following their instructions and oath.

### d. The Ohio Supreme Court's Decision to The Contrary Was Unreasonable

The Supreme Court of Ohio's determination that *Gray* does not extend to ineffective assistance of counsel cases is unreasonable. Whether defense counsel could have rehabilitated a juror will always be speculative, thus leaving defendants with no recourse where defense counsel

errs and that error causes prejudice.    Petitioner has no way of proving that rehabilitation would have been successful because the attorney's failure necessarily leaves no record.  It should not follow that an attorney's abdication of his responsibilities can never result in prejudice within the meaning of the Sixth Amendment.  Consequently, the only rational holding would be to presume prejudice under *Gray* when, as here, the jurors responses are equivocal, and do not clearly disqualify them under *Witherspoon*.

## III.
## The Trial Court's Dismissal of Scrupled Jurors

While I believe that Petitioner's ineffective assistance of counsel claims warrant habeas relief, I do not believe that the trial court's dismissal of scrupled prospective jurors is grounds for habeas relief.  Unlike the majority, however, I see no need to resort to the amorphous concept of "federalism" to dismiss this claim, especially as both AEDPA and the doctrine of procedural default adequately protect the interest in deferring to state court proceedings.  Assuming that *Gray v. Mississippi*,481 U.S. at 667-668, is clearly established federal law, there is no justification for refusing to apply it to this case, and the majority cites no authority for doing so.  Congress has defined the circumstances in which it believes a grant habeas of relief is appropriate – where a state court's decision is contrary to or an unreasonable application of clearly established federal law – and this Court should not fashion its own doctrines in order to avoid granting the writ.

Accordingly, I would simply hold that Petitioner procedurally defaulted this claim.  As the majority correctly notes, Petitioner's counsel failed to make a contemporaneous objection to the trial court's exclusion of the scrupled jurors.  Inasmuch as Petitioner cannot show prejudice resulting from his attorney failure, his claim is defaulted.  Petitioner cannot show prejudice because his claim is meritless.  Although a trial court may not dismiss a prospective juror simply because he or she possesses scruples about the death penalty, the trial court has the authority to dismiss prospective jurors who indicate an inability to apply the law.  *Witt,* 469 U.S. at 424; *Adams v. Texas,* 448 U.S. 38, 45 (1980).  A prospective juror's statement that he or she is unable to consider the death penalty evidences an inability to apply the law.  *See Witt,* 469 U.S. at 424; *Adams,* 448 U.S. at 45. Consequently, a trial court may dismiss a prospective juror who indicates that he or she would be unable to consider the death penalty. *See Witt,* 469 U.S. at 424; *Adams,* 448 U.S. at 45. Furthermore, the prospective juror's responses need not unmistakably indicate an inability to follow the law. *Witt,* 469 U.S. at 425-26. The trial judge has the discretion to exclude a prospective juror where, "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law" and "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426.  In this case, the prospective jurors' statements were ambiguous, and the trial court acted within its discretion in excluding them.

## IV.
## Conclusion

For the reasons set forth above, I would uphold Petitioner's conviction but vacate the sentence of death imposed on Petitioner and remand for a new mitigation phase trial.